**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1945

STEPHEN V. KOLBE; ANDREW C. TURNER; WINK'S SPORTING GOODS, INCORPORATED; ATLANTIC GUNS, INCORPORATED; ASSOCIATED GUN CLUBS OF BALTIMORE, INCORPORATED; MARYLAND SHALL ISSUE, INCORPORATED; MARYLAND STATE RIFLE AND PISTOL ASSOCIATION, INCORPORATED; NATIONAL SHOOTING SPORTS FOUNDATION, INCORPORATED; MARYLAND LICENSED FIREARMS DEALERS ASSOCIATION, INCORPORATED,

     Plaintiffs – Appellants,

  and

SHAWN J. TARDY; MATTHEW GODWIN,

     Plaintiffs,

    v.

LAWRENCE J. HOGAN, Jr., in his official capacity as Governor of the State of Maryland; BRIAN E. FROSH, in his official capacity as Attorney General of the State of Maryland; COLONEL WILLIAM M. PALLOZZI, in his official capacity as Secretary of the Department of State Police and Superintendent of the Maryland State Police; MARYLAND STATE POLICE,

     Defendants – Appellees.

--------------------------

STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF FLORIDA; STATE OF IDAHO; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MICHIGAN; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NEW MEXICO; STATE OF NORTH DAKOTA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS; STATE OF UTAH; STATE OF WYOMING; COMMONWEALTH OF KENTUCKY; TRADITIONALIST YOUTH NETWORK, LLC; NATIONAL RIFLE

ASSOCIATION OF AMERICA; CRPA FOUNDATION; GUN OWNERS OF CALIFORNIA; COLORADO STATE SHOOTING ASSOCIATION; IDAHO STATE RIFLE & PISTOL ASSOCIATION; ILLINOIS STATE RIFLE ASSOCIATION; KANSAS STATE RIFLE ASSOCIATION; LEAGUE OF KENTUCKY SPORTSMEN, INC.; NEVADA FIREARMS COALITION; ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS; NEW MEXICO SHOOTING SPORTS ASSOCIATION; NEW YORK RIFLE & PISTOL ASSOCIATION; TEXAS STATE RIFLE ASSOCIATION; VERMONT FEDERATION OF SPORTSMAN'S CLUBS; VERMONT RIFLE & PISTOL ASSOCIATION; GUN OWNERS OF AMERICA, INC.; GUN OWNERS FOUNDATION; U.S. JUSTICE FOUNDATION; THE LINCOLN INSTITUTE FOR RESEARCH AND EDUCATION; THE ABRAHAM LINCOLN FOUNDATION FOR PUBLIC POLICY RESEARCH, INC.; CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND; INSTITUTE ON THE CONSTITUTION; CONGRESS OF RACIAL EQUALITY; NATIONAL CENTER FOR PUBLIC POLICY RESEARCH; PROJECT 21; PINK PISTOLS; WOMEN AGAINST GUN CONTROL; THE DISABLED SPORTSMEN OF NORTH AMERICA; LAW ENFORCEMENT LEGAL DEFENSE FUND; LAW ENFORCEMENT ACTION NETWORK; LAW ENFORCEMENT ALLIANCE OF AMERICA; INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND TRAINERS ASSOCIATION; WESTERN STATES SHERIFFS' ASSOCIATION,

Amici Supporting Appellants,

LAW CENTER TO PREVENT GUN VIOLENCE; MARYLANDERS TO PREVENT GUN VIOLENCE, INCORPORATED; BRADY CENTER TO PREVENT GUN VIOLENCE; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MASSACHUSETTS; STATE OF OREGON; DISTRICT OF COLUMBIA,

Amici Supporting Appellees.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, District Judge. (1:13-cv-02841-CCB)

─────────────

Argued: May 11, 2016                    Decided: February 21, 2017

─────────────

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, TRAXLER, KING, SHEDD, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS, Circuit Judges.

─────────────

Affirmed by published opinion. Judge King wrote the opinion for the en banc majority, in which Chief Judge Gregory and Judges Wilkinson, Motz, Keenan, Wynn, Floyd, Thacker, and Harris joined in full; Judge Diaz joined in part as to the Second Amendment claims and joined as to the Fourteenth Amendment equal protection and due process claims; and Judges Niemeyer, Shedd, and Agee joined as to the Fourteenth Amendment claims only. Judge Wilkinson wrote a concurring opinion, in which Judge Wynn joined. Judge Diaz wrote an opinion concurring in part and concurring in the judgment as to the Second Amendment claims. Judge Traxler wrote a dissenting opinion as to the Second Amendment claims, in which Judges Niemeyer, Shedd, and Agee joined. Judge Traxler also wrote an opinion dissenting as to the Fourteenth Amendment equal protection claim and concurring in the judgment as to the Fourteenth Amendment due process claim.

---

**ARGUED:** John Parker Sweeney, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants. Matthew John Fader, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** T. Sky Woodward, James W. Porter, III, Marc A. Nardone, BRADLEY ARANT BOULT CUMMINGS LLP, Washington, D.C., for Appellants. Brian E. Frosh, Attorney General of Maryland, Jennifer L. Katz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. Kyle J. Bristow, BRISTOW LAW, PLLC, Clarkston, Michigan; Jason Van Dyke, THE VAN DYKE LAW FIRM, PLLC, Plano, Texas, for Amicus Traditionalist Youth Network, LLC. Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Julie Marie Blake, Erica N. Peterson, Gilbert Dickey, Assistant Attorneys General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia; Luther Strange, Attorney General of Alabama, Montgomery, Alabama, for Amicus State of Alabama; Michael C. Geraghty, Attorney General of Alaska, Juneau, Alaska, for Amicus State of Alaska; Thomas C. Horne, Attorney General of Arizona, Phoenix, Arizona, for Amicus State of Arizona; Pam Bondi, Attorney General of Florida, Tallahassee, Florida, for Amicus State of Florida; Lawrence G. Wasden, Attorney General of Idaho, Boise, Idaho, for Amicus State of Idaho; Derek Schmidt, Attorney General of Kansas, Topeka, Kansas, for Amicus State of Kansas; James D. Caldwell, Attorney General of Louisiana, Baton Rouge, Louisiana, for Amicus State of Louisiana; Bill Schuette, Attorney General of Michigan, Lansing, Michigan, for Amicus State of Michigan; Chris Koster, Attorney General of Missouri,

3

Jefferson City, Missouri, for Amicus State of Missouri; Timothy C. Fox, Attorney General of Montana, Helena, Montana, for Amicus State of Montana; Jon Bruning, Attorney General of Nebraska, Lincoln, Nebraska, for Amicus State of Nebraska; Gary King, Attorney General of New Mexico, Santa Fe, New Mexico, for Amicus State of New Mexico; Wayne Stenehjem, Attorney General of North Dakota, Bismarck, North Dakota, for Amicus State of North Dakota; E. Scott Pruitt Attorney General of Oklahoma, Oklahoma City, Oklahoma, for Amicus State of Oklahoma; Alan Wilson, Attorney General of South Carolina, Columbia, South Carolina, for Amicus State of South Carolina; Martin J. Jackley, Attorney General of South Dakota, Pierre, South Dakota, for Amicus State of South Dakota; Greg Abbott, Attorney General of Texas, Austin, Texas, for Amicus State of Texas; Sean Reyes, Attorney General of Utah, Salt Lake City, Utah, for Amicus State of Utah; Peter K. Michael, Attorney General of Wyoming, Cheyenne, Wyoming, for Amicus State of Wyoming; Jack Conway, Attorney General of Kentucky, Frankfort, Kentucky, for Amicus Commonwealth of Kentucky. Charles J. Cooper, David H. Thompson, Peter A. Patterson, John D. Ohlendorf, COOPER & KIRK, PLLC, Washington, D.C., for Amicus National Rifle Association of America, Inc. C.D. Michel, Clinton B. Monfort, Anna M. Barvir, MICHEL & ASSOCIATES, P.C., Long Beach, California, for Amici CRPA Foundation, Gun Owners of California, Colorado State Shooting Association, Idaho State Rifle & Pistol Association, Illinois State Rifle Association, Kansas State Rifle Association, League of Kentucky Sportsmen, Inc., Nevada Firearms Coalition, Association of New Jersey Rifle & Pistol Clubs, New Mexico Shooting Sports Association, New York State Rifle & Pistol Association, Texas State Rifle Association, Vermont Federation of Sportsmen's Clubs, and Vermont Rifle & Pistol Association. Michael Connelly, U.S. JUSTICE FOUNDATION, Ramona, California, for Amicus U.S. Justice Foundation; Robert J. Olson, Herbert W. Titus, William J. Olson, John S. Miles, Jeremiah L. Morgan, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Amici Gun Owners of America, Inc., Gun Owners Foundation, U.S. Justice Foundation, The Lincoln Institute for Research and Education, The Abraham Lincoln Foundation for Public Policy Research, Inc., Conservative Legal Defense and Education Fund, and Institute on the Constitution. Brian S. Koukoutchos, Mandeville, Louisiana; James B. Astrachan, ASTRACHAN GUNST THOMAS, P.C., Baltimore, Maryland, for Amici Congress of Racial Equality, National Center for Public Policy Research, Project 21, Pink Pistols, Women Against Gun Control, and The Disabled Sportsmen of North America. Dan M. Peterson, DAN M. PETERSON, PLLC, Fairfax, Virginia, for Amici The Law Enforcement Legal Defense Fund, Law Enforcement Action Network, Law Enforcement Alliance of America,

4

International Law Enforcement Educators and Trainers Association, and Western States Sheriffs' Association. Jonathan K. Baum, Chicago, Illinois, Mark T. Ciani, KATTEN MUCHIN ROSENMAN LLP, New York, New York, for Amici Law Center to Prevent Gun Violence and Marylanders to Prevent Gun Violence, Inc. Jonathan E. Lowy, Kelly Sampson, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C.; Elliott Schulder, Suzan F. Charlton, Amit R. Vora, Catlin Meade, Stephen Kiehl, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Brady Center To Prevent Gun Violence. Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Claude S. Platton, Assistant Solicitor General, Eric T. Schneiderman, Attorney General of the State of New York, for Amicus State of New York; Kamala D. Harris, Attorney General of California, Sacramento, California, for Amicus State of California; George Jepsen, Attorney General of Connecticut, Hartford, Connecticut, for Amicus State of Connecticut; Russell A. Suzuki, Attorney General of Hawaii, Honolulu, Hawaii, for Amicus State of Hawaii; Lisa Madigan, Attorney General of Illinois, Chicago, Illinois, for Amicus State of Illinois; Thomas J. Miller, Attorney General of Iowa, Des Moines, Iowa, for Amicus State of Iowa; Martha Coakley, Attorney General of Massachusetts, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts; Ellen F. Rosenblum, Attorney General of Oregon, Salem, Oregon, for Amicus State of Oregon; Karl A. Racine, Attorney General of The District of Columbia, Washington, D.C., for Amicus The District of Columbia. J. Adam Skaggs, Mark Anthony Frasetto, EVERYTOWN FOR GUN SAFETY, New York, New York; Deepak Gupta, Jonathan E. Taylor, Neil K. Sawhney, GUPTA WESSLER PLLC, Washington, D.C., for Amicus Everytown for Gun Safety.

————————————

KING, Circuit Judge:

On the morning of December 14, 2012, in Newtown, Connecticut, a gunman used an AR-15-type Bushmaster rifle and detachable thirty-round magazines to murder twenty first-graders and six adults in the Sandy Hook Elementary School. Two additional adults were injured by gunfire, and just twelve children in the two targeted classrooms were not shot. Nine terrified children ran from one of the classrooms when the gunman paused to reload, while two youngsters successfully hid in a restroom. Another child was the other classroom's sole survivor. In all, the gunman fired at least 155 rounds of ammunition within five minutes, shooting each of his victims multiple times.

Both before and after Newtown, similar military-style rifles and detachable magazines have been used to perpetrate mass shootings in places whose names have become synonymous with the slaughters that occurred there — like Aurora, Colorado (twelve killed and at least fifty-eight wounded in July 2012 in a movie theater), and San Bernardino, California (fourteen killed and more than twenty wounded in December 2015 at a holiday party). In the early morning hours of June 12, 2016, a gunman killed forty-nine and injured fifty-three at the Pulse nightclub in Orlando, Florida, making it the site of this country's deadliest mass shooting yet. According to news

6

reports, the Orlando gunman used a Sig Sauer MCX, a semiautomatic rifle that was developed at the request of our Army's special forces and is known in some military circles as the "Black Mamba." Other massacres have been carried out with handguns equipped with magazines holding more than ten rounds, including those at Virginia Tech (thirty-two killed and at least seventeen wounded in April 2007) and Fort Hood, Texas (thirteen killed and more than thirty wounded in November 2009), as well as in Binghamton, New York (thirteen killed and four wounded in April 2009 at an immigration center), and Tucson, Arizona (six killed and thirteen wounded in January 2011 at a congresswoman's constituent meeting in a grocery store parking lot).

In response to Newtown and other mass shootings, the duly elected members of the General Assembly of Maryland saw fit to enact the State's Firearm Safety Act of 2013 (the "FSA"), which bans the AR-15 and other military-style rifles and shotguns (referred to as "assault weapons") and detachable large-capacity magazines. The plaintiffs in these proceedings contest the constitutionality of the FSA with a pair of Second Amendment claims — one aimed at the assault weapons ban, the other at the prohibition against large-capacity magazines — plus Fourteenth Amendment equal protection and due process claims.

On cross-motions for summary judgment, a distinguished judge in the District of Maryland ruled in August 2014 that the

7

FSA is constitutional and thus awarded judgment to the defendants. See Kolbe v. O'Malley, 42 F. Supp. 3d 768 (D. Md. 2014) (the "Opinion"). Addressing the plaintiffs' Second Amendment claims under the Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570 (2008), the district court expressed grave doubt that the banned assault weapons and large-capacity magazines are constitutionally protected arms. Nevertheless, the court ultimately assumed that the FSA implicates the Second Amendment and subjected it to the "intermediate scrutiny" standard of review. In the wake of Heller, four of our sister courts of appeals have also rejected Second Amendment challenges to bans on assault weapons and large-capacity magazines, including two (the Second and District of Columbia Circuits) that utilized an analysis similar to the district court's.

In early February of 2016, a divided three-judge panel of this Court vacated the Opinion's Second Amendment rulings and remanded to the district court, directing the application of the more restrictive standard of "strict scrutiny" to the FSA. See Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016). Pursuant to its reading of Heller, the panel majority determined that the banned assault weapons and large-capacity magazines are indeed protected by the Second Amendment, and that the FSA substantially burdens the core Second Amendment right to use

8

arms for self-defense in the home. We thereby became the first and only court of appeals to rule that a ban on assault weapons or large-capacity magazines deserves strict scrutiny. Meanwhile, the panel affirmed the district court's denial of the plaintiffs' Fourteenth Amendment claims. On March 4, 2016, the panel's decision was vacated in its entirety by our Court's grant of rehearing en banc in this case. We heard argument en banc on May 11, 2016, and the appeal is now ripe for disposition.

As explained below, we are satisfied to affirm the district court's judgment, in large part adopting the Opinion's cogent reasoning as to why the FSA contravenes neither the Second Amendment nor the Fourteenth. We diverge from the district court on one notable point: We conclude — contrary to the now-vacated decision of our prior panel — that the banned assault weapons and large-capacity magazines are <u>not</u> protected by the Second Amendment. That is, we are convinced that the banned assault weapons and large-capacity magazines are among those arms that are "like" "M-16 rifles" — "weapons that are most useful in military service" — which the <u>Heller</u> Court singled out as being beyond the Second Amendment's reach. <u>See</u> 554 U.S. at 627 (rejecting the notion that the Second Amendment safeguards "M-16 rifles and the like"). Put simply, we have no power to extend Second Amendment protection to the weapons of war that

9

the Heller decision explicitly excluded from such coverage. Nevertheless, we also find it prudent to rule that — even if the banned assault weapons and large-capacity magazines are somehow entitled to Second Amendment protection — the district court properly subjected the FSA to intermediate scrutiny and correctly upheld it as constitutional under that standard of review.

I.

A.

The General Assembly of Maryland passed the FSA on April 4, 2013, the Governor signed it into law that May 16, and it became effective several months later on October 1. The FSA provides that a person may neither "transport an assault weapon into the State" nor "possess, sell, offer to sell, transfer, purchase, or receive an assault weapon." See Md. Code Ann., Crim. Law § 4-303(a). The banned assault weapons include "assault long gun[s]" and "copycat weapon[s]." Id. § 4-301(d).

The FSA defines an assault long gun as a rifle or shotgun "listed under § 5-101(r)(2) of the Public Safety Article," including the "Colt AR-15," "Bushmaster semi-auto rifle," and "AK-47 in all forms." See Md. Code Ann., Crim. Law § 4-301(b); Md. Code Ann., Pub. Safety § 5-101(r)(2). The list of prohibited rifles and shotguns consists of "specific assault

10

weapons <u>or their copies</u>, regardless of which company produced and manufactured that assault weapon." <u>See</u> Md. Code Ann., Pub. Safety § 5-101(r)(2) (emphasis added).[1]

_____

[1] The rifles and shotguns specifically identified as banned in section 5-101(r)(2) — mostly semiautomatic rifles — are as follows:

(i) American Arms Spectre da Semiautomatic carbine; (ii) AK-47 in all forms; (iii) Algimec AGM-1 type semi-auto; (iv) AR 100 type semi-auto; (v) AR 180 type semi-auto; (vi) Argentine L.S.R. semi-auto; (vii) Australian Automatic Arms SAR type semi-auto; (viii) Auto-Ordnance Thompson M1 and 1927 semi-automatics; (ix) Barrett light .50 cal. semi-auto; (x) Beretta AR70 type semi-auto; (xi) Bushmaster semi-auto rifle; (xii) Calico models M-100 and M-900; (xiii) CIS SR 88 type semi-auto; (xiv) Claridge HI TEC C-9 carbines; (xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle; (xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2; (xvii) Dragunov Chinese made semi-auto; (xviii) Famas semi-auto (.223 caliber); (xix) Feather AT-9 semi-auto; (xx) FN LAR and FN FAL assault rifle; (xxi) FNC semi-auto type carbine; (xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; (xxiii) Steyr-AUG-SA semi-auto; (xxiv) Galil models AR and ARM semi-auto; (xxv) Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3; (xxvi) Holmes model 88 shotgun; (xxvii) Avtomat Kalashnikov semiautomatic rifle in any format; (xxviii) Manchester Arms "Commando" MK-45, MK-9; (xxix) Mandell TAC-1 semi-auto carbine; (xxx) Mossberg model 500 Bullpup assault shotgun; (xxxi) Sterling Mark 6; (xxxii) P.A.W.S. carbine; (xxxiii) Ruger mini-14 folding stock model (.223 caliber); (xxxiv) SIG 550/551 assault rifle (.223 caliber); (xxxv) SKS with detachable magazine; (xxxvi) AP-74 Commando type semi-auto; (xxxvii) Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand; (xxxviii) Street sweeper assault type shotgun; (xxxix) Striker 12 assault shotgun in all formats; (xl) Unique F11 semi-auto type; (xli) Daewoo USAS 12 (Continued)

The FSA provides a separate definition for a copycat weapon that is premised on a weapon's characteristics, rather than being identified by a list of specific firearms.  In relevant part, a copycat weapon means:

> (i)     a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
>
> > 1.   a folding stock;
> >
> > 2.   a grenade launcher or flare launcher; or
> >
> > 3.   a flash suppressor;
>
> (ii)    a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;
>
> (iii)   a semiautomatic centerfire rifle that has an overall length of less than 29 inches;
>
> > \* \* \*
>
> (v)     a semiautomatic shotgun that has a folding stock; or
>
> (vi)    a shotgun with a revolving cylinder.

See Md. Code Ann., Crim. Law § 4-301(e)(1).  The FSA excludes assault long guns — those enumerated in section 5-101(r)(2) of

---

semi-auto shotgun; (xlii) UZI 9mm carbine or rifle; (xliii) Valmet M-76 and M-78 semi-auto; (xliv) Weaver Arms "Nighthawk" semi-auto carbine; or (xlv) Wilkinson Arms 9mm semi-auto "Terry."

See Md. Code Ann., Pub. Safety § 5-101(r)(2).

12

the Public Safety Article and their copies — from the definition of a copycat weapon. See Md. Code Ann., Crim. Law § 4-301(e)(2).[2]

In banning large-capacity magazines along with assault weapons, the FSA provides that "[a] person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm." See Md. Code Ann., Crim. Law § 4-305(b). A detachable magazine is defined as "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge." Id. § 4-301(f).

A person who violates the FSA is subject to criminal prosecution and imprisonment for up to three years plus a fine not exceeding $5,000. See Md. Code Ann., Crim. Law § 4-306(a). A longer prison term is mandatory if a person uses an assault weapon or large-capacity magazine in the commission of a felony or crime of violence, i.e., five to twenty years for a first

---

[2] Although the FSA also identifies "assault pistol[s]" as assault weapons, see Md. Code Ann., Crim. Law § 4-301(c), (d)(2), the plaintiffs have not challenged the FSA's prohibition against assault pistols. Thus, our discussion of the banned assault weapons is limited to assault long guns and those copycat weapons that are rifles and shotguns.

13

violation, and ten to twenty years for each subsequent violation.  See id. § 4-306(b).

Under the FSA's exceptions, "[a] licensed firearms dealer may continue to possess, sell, offer for sale, or transfer an assault long gun or a copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013," and "[a] person who lawfully possessed, has a purchase order for, or completed an application to purchase an assault long gun or a copycat weapon before October 1, 2013, may . . . possess and transport the assault long gun or copycat weapon."  See Md. Code Ann., Crim. Law § 4-303(b)(2), (3)(i).  The FSA does not ban the possession of a large-capacity magazine.  Further, the FSA explicitly allows the receipt and possession of an assault weapon or large-capacity magazine by a retired Maryland law enforcement officer if the assault weapon or large-capacity magazine "is sold or transferred to the person by the law enforcement agency on retirement" or "was purchased or obtained by the person for official use with the law enforcement agency before retirement."  Id. § 4-302(7).

### B.

On September 26, 2013, the plaintiffs filed their initial Complaint in the District of Maryland.  The following day, they requested a temporary restraining order from the district court, seeking to bar the defendants from enforcing the challenged

14

provisions of the FSA once it took effect on October 1, 2013. The court conducted a hearing on October 1 and denied the requested temporary restraining order from the bench. Thereafter, the parties agreed that the court should proceed to resolve the merits of the litigation on cross-motions for summary judgment.

The operative Third Amended Complaint, filed on November 22, 2013, asks for declaratory and injunctive relief. It alleges the FSA is facially unconstitutional in four respects: (1) the assault weapons ban contravenes the Second Amendment; (2) the prohibition against large-capacity magazines also violates the Second Amendment; (3) the provision allowing receipt and possession of assault weapons and large-capacity magazines by retired Maryland law enforcement officers contravenes the Equal Protection Clause of the Fourteenth Amendment; and (4) the provision outlawing "copies" of the rifles and shotguns enumerated in section 5-101(r)(2) of the Public Safety Article violates the Fourteenth Amendment's Due Process Clause by being too vague to provide adequate notice of the conduct proscribed.

The plaintiffs include Stephen V. Kolbe and Andrew Turner, two Maryland residents who have asserted that they would purchase assault weapons and large-capacity magazines but for the FSA. Other plaintiffs are firearms dealers in Maryland and

15

firearms-related associations: Wink's Sporting Goods, Incorporated; Atlantic Guns, Incorporated; Associated Gun Clubs of Baltimore, Incorporated; Maryland Shall Issue, Incorporated; Maryland State Rifle and Pistol Association, Incorporated; National Shooting Sports Foundation, Incorporated; and Maryland Licensed Firearms Dealers Association, Incorporated. See Kolbe v. O'Malley, 42 F. Supp. 3d 768, 774 n.3 (D. Md. 2014) (concluding that "a credible threat of prosecution under the [FSA]" confers standing on individual plaintiffs Kolbe and Turner, and thus "jurisdiction is secure . . . whether or not the additional plaintiffs have standing" (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 & n.9 (1977))).

The plaintiffs' claims are made against four defendants in their official capacities: Lawrence J. Hogan, Jr., Governor of the State of Maryland, as successor to Martin J. O'Malley; Brian E. Frosh, the State's Attorney General, as successor to Douglas F. Gansler; Colonel William M. Pallozzi, Secretary of the Department of State Police and Superintendent of the Maryland State Police, as successor to Colonel Marcus L. Brown; and the Maryland State Police. We hereafter refer to the defendants collectively as the "State."

16

C.

1.

In support of its motion for summary judgment, the State proffered extensive uncontroverted evidence demonstrating that the assault weapons outlawed by the FSA are exceptionally lethal weapons of war.[3]  A prime example of the State's evidence is that the most popular of the prohibited assault weapons — the AR-15 — is simply the semiautomatic version of the M16 rifle used by our military and others around the world.  Accord Staples v. United States, 511 U.S. 600, 603 (1994) (observing that "[t]he AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon").

The State's evidence imparts that the AR-15 was developed after World War II for the U.S. military.  It was designed as a selective-fire rifle — one that can be fired in either automatic mode (firing continuously as long as the trigger is depressed) or semiautomatic mode (firing one round of ammunition for each

---

[3] By the Opinion of August 22, 2014, explaining its award of summary judgment to the State, the district court also denied the plaintiffs' motion to exclude certain of the State's expert and fact evidence.  See Kolbe, 42 F. Supp. 3d at 775, 777-82. In this appeal, the plaintiffs challenge the court's evidentiary rulings.  Because the court did not abuse its discretion in making the evidentiary rulings, we affirm those rulings and rely on evidence that the court properly declined to exclude.  See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538 (4th Cir. 2015).

pull of the trigger and, after each round is fired, automatically loading the next). In combat-style testing conducted in 1959, it was "discovered that a 7- or even 5-man squad armed with AR-15s could do as well or better in hit-and-kill potential . . . than the traditional 11-man squad armed with M14 rifles," which were the heavier selective-fire rifles then used by soldiers in the Army. See J.A. 930.[4] Subsequent field testing in Vietnam, in 1962, revealed the AR-15 "to be a very lethal combat weapon" that was "well-liked . . . for its size and light recoil." Id. at 968. Reports from that testing indicated that "the very high-velocity AR-15 projectiles" had caused "[a]mputations of limbs, massive body wounds, and decapitations." Id.

Within the next few years, the Department of Defense purchased more than 100,000 AR-15 rifles for the Army and the Air Force, and the military changed the name "AR-15" to "M16." By that time, the former Soviet Union was already producing the AK-47, a selective-fire rifle which, like the AR-15/M16, was developed for offensive use and has been adopted by militaries around the world. Various firearms companies have since manufactured civilian versions of the AR-15 and AK-47 that are

---

[4] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

18

semiautomatic but otherwise retain the military features and capabilities of the fully automatic M16 and AK-47. Several other FSA-banned assault weapons are — like the AR-15 and semiautomatic AK-47 — semiautomatic versions of machineguns initially designed for military use. See, e.g., J.A. 1257 (UZI and Galil rifles); id. at 1260 (Fabrique National ("FN") assault rifles); id. at 1261 (Steyr AUG rifles).

The difference between the fully automatic and semiautomatic versions of those firearms is slight. That is, the automatic firing of all the ammunition in a large-capacity thirty-round magazine takes about two seconds, whereas a semiautomatic rifle can empty the same magazine in as little as five seconds. See, e.g., J.A. 1120 ("[S]emiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns."). Moreover, soldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations.

The AR-15, semiautomatic AK-47, and other assault weapons banned by the FSA have a number of features designed to achieve their principal purpose — "killing or disabling the enemy" on the battlefield. See J.A. 735. For example, some of the banned assault weapons incorporate flash suppressors, which are

19

designed to help conceal a shooter's position by dispersing muzzle flash. Others possess barrel shrouds, which enable "spray-firing" by cooling the barrel and providing the shooter a "convenient grip." Id. at 1121. Additional military features include folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines.

Several manufacturers of the banned assault weapons, in advertising them to the civilian market, tout their products' battlefield prowess. Colt's Manufacturing Company boasts that its AR-15 rifles are manufactured "based on the same military standards and specifications as the United States issue Colt M16 rifle and M4 carbine." See J.A. 1693. Bushmaster describes its Adaptive Combat Rifle as "the ultimate military combat weapons system" that is "[b]uilt specifically for law enforcement and tactical markets." Id. at 1697.

In short, like their fully automatic counterparts, the banned assault weapons "are firearms designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed." See J.A. 206. Their design results in "a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns." Id. at 1121-22.

Correspondingly, the large-capacity magazines prohibited by the FSA allow a shooter to fire more than ten rounds without having to pause to reload, and thus "are particularly designed and most suitable for military and law enforcement applications." See J.A. 891. Such magazines are "designed to enhance" a shooter's "capacity to shoot multiple human targets very rapidly." Id. at 1151. Large-capacity magazines are a feature common, but not unique, to the banned assault weapons, many of which are capable of accepting magazines of thirty, fifty, or even 100 rounds.

With limited exceptions, M16s and other machineguns have been banned nationwide since 1986. See 18 U.S.C. § 922(o)(1) (rendering it "unlawful for any person to transfer or possess a machinegun"); 26 U.S.C. § 5845(b) (defining a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger"). By that time, the private ownership of machineguns was substantially circumscribed as a result of heavy taxes and strict regulations imposed almost fifty years earlier by the National Firearms Act of 1934. See United States v. Miller, 307 U.S. 174 (1939) (outlining 1934 Act's requirements for transferring and registering firearms, including short-barreled shotguns and machineguns, and rejecting Second Amendment

21

challenge thereto). There have also been various state and local prohibitions against the receipt, possession, and transfer of machineguns.

In 1994, Congress enacted a ban on certain semiautomatic military-style weapons and magazines capable of holding more than ten rounds. The federal ban applied only to assault weapons and magazines manufactured after September 13, 1994, however, and it expired a decade later on September 13, 2004. Just months before Congress passed the 1994 federal assault weapons ban, Maryland had enacted a state law prohibiting assault pistols and the transfer of magazines with a capacity in excess of twenty rounds. The same state law regulated what the FSA now identifies as assault long guns by requiring that purchasers first complete an application and undergo a background check. Maryland replaced that law with the FSA in 2013, spurred by Newtown and other mass shootings.[5]

---

[5] Dr. Christopher Koper, a social scientist who has studied the effects of the 1994 federal assault weapons ban, explained in these proceedings that the federal ban had several features that may have limited its efficacy and that are not present in Maryland's FSA. One such feature was the federal ban's broader "grandfather" clause, rendering its prohibitions applicable solely to assault weapons and large-capacity magazines manufactured after the ban's effective date of September 13, 1994. In contrast, the FSA grandfathers only assault weapons owned prior to its effective date, and "does not allow the further sale, transfer, or receipt of those firearms." See J.A. 362. With respect to large-capacity magazines, or "LCMs," the FSA does not bar their transport into Maryland, but "is still (Continued)

22

The State has calculated that — accepting the plaintiffs' estimate that there were at least 8 million FSA-banned assault weapons in circulation in the United States by 2013 — those weapons comprised less than 3% of the more than 300 million firearms in this country. Moreover, premised on the plaintiffs' evidence that owners of the banned assault weapons possessed an average of 3.1 of them in 2013, the State has reckoned that less than 1% of Americans owned such a weapon that year.

At the same time, according to the State's evidence, the FSA-banned assault weapons have been used disproportionately to their ownership in mass shootings and the murders of law enforcement officers. Even more frequently, such incidents have involved large-capacity magazines. One study of sixty-two mass shootings between 1982 and 2012, for example, found that the perpetrators were armed with assault rifles in 21% of the massacres and with large-capacity magazines in 50% or more (as it was unknown to the researchers whether large-capacity magazines were involved in many of the cases). Another study

more stringent than the federal ban, which not only allowed the possession of any existing LCMs, but also: (i) the importation for sale of large stocks of LCMs from other countries; and (ii) the ongoing sale, transfer, and receipt of both existing stocks of LCMs and the newly-imported LCMs." Id. at 363. The federal assault weapons ban, in Koper's words, "did not even preclude individuals from going to the gun store around the corner to purchase a [large-capacity magazine]." Id.

determined that assault weapons, including long guns and handguns, were used in 16% of the murders of on-duty law enforcement officers in 1994, and that large-capacity magazines were used in 31% to 41% of those murders. The banned assault weapons have also been used in other crimes, including the infamous "D.C. Sniper" shootings in 2002, in which an AR-15-type Bushmaster rifle was used to kill and critically injure more than a dozen randomly selected victims, including several in Maryland.[6]

The State has emphasized that, when the banned assault weapons and large-capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines. The banned assault weapons further pose a heightened risk to civilians in that "rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials." See J.A. 279. Criminals armed with the banned assault weapons possess a "military-style advantage" in firefights with law enforcement officers, as such weapons "allow

---

[6] Tragic events involving assault weapons continue to occur. On July 7, 2016, a shooter armed with a semiautomatic assault rifle killed five law enforcement officers and injured nine others, plus two civilians, in Dallas, Texas. Just ten days later, on July 17, 2016, another shooter armed with a semiautomatic assault rifle shot six police officers in Baton Rouge, Louisiana, killing three of them.

criminals to effectively engage law enforcement officers from great distances" and "their rounds easily pass through the soft body armor worn by most law enforcement officers." See id. at 227, 265.

For their part, large-capacity magazines enable shooters to inflict mass casualties while depriving victims and law enforcement officers of opportunities to escape or overwhelm the shooters while they reload their weapons. Even in the hands of law-abiding citizens, large-capacity magazines are particularly dangerous. The State's evidence demonstrates that, when inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders.

The State has also underscored the lack of evidence that the banned assault weapons and large-capacity magazines are well-suited to self-defense. Neither the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle or shotgun, or needed to fire more than ten rounds, to protect herself. Although self-defense is a conceivable use of the banned assault weapons, the State's evidence reflects — consistent with the Supreme Court's Heller decision — that most individuals choose to keep other firearms for that purpose. See District of Columbia v. Heller, 554 U.S. 570, 628 (2008)

(emphasizing that handguns are "overwhelmingly chosen by American society for [self-defense]"). Moreover, the State's evidence substantiates "that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds." See J.A. 649. Studies of "armed citizen" stories collected by the National Rifle Association, covering 1997-2001 and 2011-2013, found that the average number of shots fired in self-defense was 2.2 and 2.1, respectively. Id. at 650.

In support of the FSA, the State garnered evidence showing that the prohibitions against assault weapons and large-capacity magazines will promote public safety by reducing the availability of those armaments to mass shooters and other criminals, by diminishing their especial threat to law enforcement officers, and by hindering their unintentional misuse by civilians. The State does not expect the FSA to eradicate all gun crimes and accidents, but rather to curtail those that result in more shots fired and more deaths and injuries because they are committed with military-style firearms and magazines.

The State's evidence indicates that the FSA will reduce the availability of the banned assault weapons and large-capacity magazines to criminals by "reducing their availability overall." See J.A. 228. That is because criminals usually obtain their firearms through straw purchases, by buying them on the

secondary market, or by stealing them from law-abiding persons, and most criminals "are simply not dedicated enough to a particular type of firearm or magazine to go to great lengths to acquire something that is not readily available." Id. at 232.

The State has also pointed to an important lesson learned from Newtown (where nine children were able to run from a targeted classroom while the gunman paused to change out a large-capacity thirty-round magazine), Tucson (where the shooter was finally tackled and restrained by bystanders while reloading his firearm), and Aurora (where a 100-round drum magazine was emptied without any significant break in the firing). That is, reducing the number of rounds that can be fired without reloading increases the odds that lives will be spared in a mass shooting. For example, a shooter's use of ten-round magazines — rather than those that hold thirty, fifty, or 100 rounds — would for every 100 rounds fired afford

> six to nine more chances for bystanders or law enforcement to intervene during a pause in firing, six to nine more chances for something to go wrong with a magazine during a change, six to nine more chances for the shooter to have problems quickly changing a magazine under intense pressure, and six to nine more chances for potential victims to find safety during a pause in firing.

See J.A. 266. Thus, the State has justified the FSA on the ground that limiting a shooter to a ten-round magazine could

27

"mean the difference between life and death for many people."
Id.

2.

For their part, the plaintiffs have purported to dispute the State's evidence equating the FSA-banned assault weapons with the M16, but have not produced evidence actually demonstrating that the banned assault weapons are less dangerous than or materially distinguishable from military arms. Otherwise, the plaintiffs have emphasized the popularity of the banned assault weapons, particularly the AR-15, semiautomatic AK-47, and their copies. Those weapons are often referred to by the plaintiffs, and in their evidence, as "modern sporting rifles."

As previously mentioned, the plaintiffs have asserted that there were at least 8 million FSA-banned assault weapons in circulation in the United States by 2013. Rifles based on the AR-15 and AK-47 accounted for approximately 20% of firearm sales in the United States in 2012, and the banned assault weapons comprised between 18% and 30% of all regulated firearm transfers in Maryland in 2013. The plaintiffs' evidence reflects that, since it was first marketed to the public in 1963, "[t]he AR-15 has become the most popular civilian rifle design in America, and is made in many variations by many companies." See J.A. 2259.

28

The plaintiffs have also focused on the popularity of large-capacity magazines, tendering evidence that in the United States between 1990 and 2012, magazines capable of holding more than ten rounds numbered around 75 million, or 46% of all magazines owned. Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds. Firearms capable of firing more than ten rounds without reloading may have existed since the late sixteenth century, and magazines with a capacity of between ten and twenty rounds have been on the civilian market for more than a hundred years.

Individual plaintiffs Kolbe and Turner have averred that they wish to own banned assault weapons and large-capacity magazines for self-defense. The plaintiffs have more generally asserted that many owners of assault weapons cite home protection as a reason for keeping those weapons, along with other lawful purposes such as hunting and competitive marksmanship.[7] The plaintiffs regard large-capacity magazines as

---

[7] Prior to the en banc argument, we allowed the plaintiffs to file a supplemental appendix containing two reports published in 2015 by the National Shooting Sports Foundation (the "NSSF"), including a "Firearms Retailer Survey Report" outlining the results of an online survey of more than 500 firearms retailers across the country. Relevant to the issue of self-defense, one survey question asked: "Of your annual firearm sales [for each year from 2011 to 2014], please report the percentages you think were sold primarily for hunting, target-shooting and personal-
(Continued)

especially useful for self-defense, because it is difficult for a civilian to change a magazine while under the stress of defending herself and her family from an unexpected attack. Moreover, a civilian firing rounds in self-defense will frequently miss her assailant, rendering it "of paramount importance that [she] have quick and ready access to ammunition in quantities sufficient to provide a meaningful opportunity to defend herself and/or her loved ones." See J.A. 2123.

To refute the theory that the FSA will effectuate Maryland's goal of protecting its citizens and law enforcement officers, the plaintiffs have pointed to a variety of evidence. For example, the FSA does not disallow the Colt AR-15 Sporter H-BAR rifle, which the plaintiffs' evidence suggests "could be made into a compact lightweight short-barrel AR pattern rifle identical to the restricted models" while remaining "exempted from the restrictions of the law." See J.A. 2270-71. The plaintiffs' evidence also indicates that rounds from firearms not prohibited by the FSA are capable of penetrating building materials and soft body armor; that "[t]he banned firearms are

---

protection purposes." See J.A. 3063. The respondents indicated that they "think" between 28.1% and 30.5% of "AR-style/modern sporting rifles" were sold primarily for personal protection. Id. The NSSF report, however, does not reveal why the respondents "think" that.

almost never used in crimes"; that, "in 2012, there was a greater probability that a person in the United States would be killed by someone strangling them than by an assault rifle in a mass shooting"; and that "[m]ore officers are killed in car accidents than with the banned firearms." See id. at 2160, 2280-81, 2371-97. Additionally, the plaintiffs have emphasized that, because the FSA does not prohibit the possession of large-capacity magazines, a criminal can legally purchase those magazines in another state and return with them to Maryland.[8]

## II.

On appeal, the plaintiffs contend that the district court erred in ruling in favor of the State on the parties' cross-motions for summary judgment. More specifically, the plaintiffs

---

[8] Further attacking Maryland's justification for the FSA, the plaintiffs have endeavored to show that the 1994 federal ban on assault weapons and large-capacity magazines was ineffective, and thus that the FSA will be a failure, too. In so doing, the plaintiffs rely on snippets from the studies of the State's expert, Dr. Koper. See supra note 5. Dr. Koper ultimately concluded, however, that — despite features of the federal ban that may have limited its efficacy (including its grandfather clause for assault weapons and large-capacity magazines manufactured prior to its effective date) — the federal ban had some success and could have had more had it remained in effect. Additionally, Dr. Koper opined that Maryland's stricter FSA has "the potential to prevent and limit shooting injuries in the state over the long-run" and thereby "advance Maryland's interest in reducing the harms caused by gun violence." See J.A. 364.

31

seek reversal of the adverse summary judgment award and entry of judgment in their favor. We review de novo the district court's summary judgment decision. See Libertarian Party of Va. v. Judd, 718 F.3d 308, 312 (4th Cir. 2013). With respect to each side's motion, "we are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party, in order to determine whether 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. at 312-13 (quoting Fed. R. Civ. P. 56(a)).

## III.

We begin with the plaintiffs' claims that the FSA's assault weapons ban and its prohibition against large-capacity magazines contravene the Second Amendment. According to the plaintiffs, they are entitled to summary judgment on the simple premise that the banned assault weapons and large-capacity magazines are protected by the Second Amendment and, thus, the FSA is unconstitutional per se. We conclude, to the contrary, that the banned assault weapons and large-capacity magazines are not constitutionally protected arms. Even assuming the Second Amendment reaches those weapons and magazines, however, the FSA is subject to — and readily survives — the intermediate scrutiny standard of review. Consequently, as to the Second

32

Amendment claims, we must affirm the district court's award of summary judgment to the State.

A.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." See U.S. Const. amend. II. In District of Columbia v. Heller, the Supreme Court recognized that the Second Amendment is divided into a prefatory clause ("A well regulated Militia, being necessary to the security of a free State, . . .") and an operative clause (". . . the right of the people to keep and bear Arms, shall not be infringed."). See 554 U.S. 570, 577 (2008). The Heller majority rejected the proposition that, because of its prefatory clause, the Second Amendment "protects only the right to possess and carry a firearm in connection with militia service." Id. Rather, the Court determined that, by its operative clause, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." Id. at 592. The Court also explained that the operative clause "fits perfectly" with the prefatory clause, in that creating the individual right to keep and bear arms served to preserve the militia that consisted of self-armed citizens at the time of the Second Amendment's ratification. Id. at 598.

33

The Second Amendment's "core protection," the Heller Court announced, is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." See 554 U.S. at 634-35. Concomitantly, the Court emphasized that "the right secured by the Second Amendment is not unlimited," in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id. at 626. The Court cautioned, for example, that it was not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id.

Of utmost significance here, the Heller Court recognized that "another important limitation on the right to keep and carry arms" is that the right "extends only to certain types of weapons." See 554 U.S. at 623, 627 (discussing United States v. Miller, 307 U.S. 174 (1939)). The Court explained that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," including "short-barreled shotguns" and "machineguns." Id. at 624-25. The Court elsewhere described "the sorts of weapons protected" as being "those in common use at the time," and observed that such "limitation is fairly supported by the

34

historical tradition of prohibiting the carrying of dangerous and unusual weapons." Id. at 627 (internal quotation marks omitted) (citing, inter alia, 4 Blackstone 148-49 (1769)).[9]

Continuing on, the Heller Court specified that "weapons that are most useful in military service — M-16 rifles and the like — may be banned" without infringement upon the Second Amendment right. See 554 U.S. at 627. The Court recognized that the lack of constitutional protection for today's military weapons might inspire the argument that "the Second Amendment right is completely detached from the prefatory clause." Id. The Court explained, however, that the fit between the prefatory and operative clauses is properly measured "at the time of the Second Amendment's ratification," when "the conception of the militia . . . was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." Id. The fit is not measured today, when a militia may "require sophisticated arms that are highly unusual in society at large," including arms that "could be useful against modern-day bombers and tanks." Id. It was therefore immaterial to the Court's interpretation

_____

[9] Although the Heller Court invoked Blackstone for the proposition that "dangerous and unusual" weapons have historically been prohibited, Blackstone referred to the crime of carrying "dangerous or unusual weapons." See 4 Blackstone 148-49 (1769) (emphasis added).

35

of the Second Amendment that "modern developments have limited the degree of fit between the prefatory clause and the protected right." Id. at 627-28. And thus, there was simply no inconsistency between the Court's interpretation of the Second Amendment and its pronouncement that some of today's weapons lack constitutional protection precisely because they "are most useful in military service."

Deciding the particular Second Amendment issues before it, the Heller Court deemed the District of Columbia's prohibition against the possession of handguns in the home to be unconstitutional. See 554 U.S. at 628-29. Without identifying and utilizing a particular standard for its review, the Court concluded that, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." Id. (footnote and internal quotation marks omitted).

The Heller Court clearly was concerned that the District of Columbia's ban extended "to the home, where the need for defense of self, family, and property is most acute." See 554 U.S. at 628. Significantly, however, the Court also was troubled by the particular type of weapon prohibited — handguns. Indeed, the Court repeatedly made comments underscoring the status of

36

handguns as "the most preferred firearm in the nation to keep and use for protection of one's home and family," including the following:

- "The handgun ban amounts to a prohibition of an entire class of arms that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]";

- "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.  It is enough to note . . . that the American people have considered the handgun to be the quintessential self-defense weapon"; and,

- "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."

See id. at 628-29 (internal quotation marks omitted).

As explained therein, the Heller decision was not intended "to clarify the entire field" of Second Amendment jurisprudence. See 554 U.S. at 635.  Since then, the Supreme Court decided in McDonald v. City of Chicago "that the Second Amendment right is fully applicable to the States," but did not otherwise amplify Heller's analysis.  See 561 U.S. 742, 750 (2010).  Just recently, in Caetano v. Massachusetts, the Court reiterated two points made by Heller:  first, "that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding'"; and, second, that there is no merit to "the proposition 'that only those weapons useful in warfare

37

are protected.'" See Caetano, 136 S. Ct. 1027, 1028 (2016) (per curiam) (alterations in original) (quoting Heller, 554 U.S. at 582, 624-25) (remanding for further consideration of whether Second Amendment protects stun guns).

The lower courts have grappled with Heller in a variety of Second Amendment cases. Like most of our sister courts of appeals, we have concluded that "a two-part approach to Second Amendment claims seems appropriate under Heller." See United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010) (citing United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)); see also N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 254 (2d Cir. 2015); GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1322 (11th Cir. 2015); United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013); Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 194 (5th Cir. 2012); United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("Heller II"); Ezell v. City of Chicago, 651 F.3d 684, 703-04 (7th Cir. 2011); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010).

Pursuant to that two-part approach, we first ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." See Chester, 628 F.3d at 680 (internal quotation marks omitted). If the

38

answer is no, "then the challenged law is valid." Id. If, however, the challenged law imposes a burden on conduct protected by the Second Amendment, we next "apply[] an appropriate form of means-end scrutiny." Id. Because "Heller left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context," we must "select between strict scrutiny and intermediate scrutiny." Id. at 682. In pinpointing the applicable standard of review, we may "look[] to the First Amendment as a guide." Id. With respect to a claim made pursuant to the First or the Second Amendment, "the level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." Id.

To satisfy strict scrutiny, the government must prove that the challenged law is "narrowly tailored to achieve a compelling governmental interest." See Abrams v. Johnson, 521 U.S. 74, 82 (1997). Strict scrutiny is thereby "the most demanding test known to constitutional law." See City of Boerne v. Flores, 521 U.S. 507, 534 (1997). The less onerous standard of intermediate scrutiny requires the government to show that the challenged law "is reasonably adapted to a substantial governmental interest." See United States v. Masciandaro, 638 F.3d 458, 471 (4th Cir.

39

2011); see also Chester, 628 F.3d at 683 ("[T]he government must demonstrate under the intermediate scrutiny standard that there is a reasonable fit between the challenged regulation and a substantial governmental objective." (internal quotation marks omitted)). Intermediate scrutiny does not demand that the challenged law "be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." See Masciandaro, 638 F.3d at 474. In other words, there must be "a fit that is 'reasonable, not perfect.'" See Woollard v. Gallagher, 712 F.3d 865, 878 (4th Cir. 2013) (quoting United States v. Carter, 669 F.3d 411, 417 (4th Cir. 2012)).

Until this Second Amendment challenge to the FSA's bans on assault weapons and large-capacity magazines, we have not had occasion to identify the standard of review applicable to a law that bars law-abiding citizens from possessing arms in their homes. In Masciandaro, we "assume[d] that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." See 638 F.3d at 470. Thereafter, in Woollard, we noted that Masciandaro had "'assume[d]'" any inside-the-home regulation would be subject to strict scrutiny, and we described the plaintiff's related — and unsuccessful — contention that "the right to arm oneself in public [is] on equal footing with the

40

right to arm oneself at home, necessitating that we apply strict scrutiny in our review of [an outside-the-home regulation]." See Woollard, 712 F.3d at 876, 878 (4th Cir. 2013) (quoting Masciandaro, 638 F.3d at 470). Notably, however, neither Masciandaro nor Woollard purported to, or had reason to, decide whether strict scrutiny always, or even ever, applies to laws burdening the right of self-defense in the home. See also, e.g., United States v. Hosford, 843 F.3d 161, 168 (4th Cir. 2016) (declining to apply strict scrutiny to a firearms prohibition that "addresses only conduct occurring outside the home," without deciding if or when strict scrutiny applies to a law reaching inside the home).

## B.

Guided by our two-part approach to Second Amendment claims, but lacking precedent of this Court or the Supreme Court examining the constitutionality of a law substantively similar to the FSA, the district court began its analysis by questioning whether the banned assault weapons and large-capacity magazines are protected by the Second Amendment. Addressing assault weapons in particular, the Opinion disclosed the court's "inclin[ation] to find the weapons fall outside Second Amendment protection as dangerous and unusual," based on "serious[] doubts that [they] are commonly possessed for lawful purposes, particularly self-defense in the home." See Kolbe v. O'Malley,

41

42 F. Supp. 3d 768, 788 (D. Md. 2014). The Opinion further observed that, "[g]iven that assault rifles like the AR-15 are essentially the functional equivalent of M-16s — and arguably more effective — the [reasoning of Heller that M-16s could be banned as dangerous and unusual] would seem to apply here." Id. at 789 n.29 (citing Heller, 554 U.S. at 627).

Ultimately, however, the district court elected to assume that the banned assault weapons and large-capacity magazines are constitutionally protected, and thus that the FSA "places some burden on the Second Amendment right." See Kolbe, 42 F. Supp. 3d at 789. The Opinion then identified intermediate scrutiny as the appropriate standard of review, because the FSA "does not seriously impact a person's ability to defend himself in the home." Id. at 790. In so ruling, the court recognized that the FSA "does not ban the quintessential weapon — the handgun — used for self-defense in the home" or "prevent an individual from keeping a suitable weapon for protection in the home." Id. at 790. Finally, applying the intermediate scrutiny standard, the Opinion recognized that the State of Maryland possesses an interest that is not just substantial — but compelling — "in providing for public safety and preventing crime." Id. at 792. A reasonable fit between that interest and the FSA was shown, according to the Opinion, by evidence of the heightened risks that the banned assault weapons and large-capacity magazines

42

pose to civilians and law enforcement officers.  See id. at 793-97.  Accordingly, the district court concluded that the FSA "does not violate the Second Amendment."  Id. at 797.

In its analysis, the district court relied in part on the 2011 decision of the District of Columbia Circuit in Heller II. The Heller II court assumed that the District's prohibitions against military-style assault rifles and large-capacity magazines impinge upon the Second Amendment right and then upheld the bans under the intermediate scrutiny standard.  See 670 F.3d at 1261-64.  After the district court issued its Opinion, statewide bans on the AR-15 and semiautomatic AK-47, other assault weapons, and large-capacity magazines in New York and Connecticut were similarly sustained by the Second Circuit's 2015 decision in N.Y. State Rifle & Pistol Ass'n.  There, the court of appeals proceeded "on the assumption that [the challenged] laws ban weapons protected by the Second Amendment"; determined "that intermediate, rather than strict, scrutiny is appropriate"; and concluded "that New York and Connecticut have adequately established a substantial relationship between the prohibition of both semiautomatic assault weapons and large-capacity magazines and the important — indeed, compelling — state interest in controlling crime."  See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 257, 260, 264.  The Supreme Court recently denied the Connecticut plaintiffs' petition for a writ

43

of certiorari in that matter.  See Shew v. Malloy, 136 S. Ct. 2486 (2016).

In the time period between Heller II and N.Y. State Rifle & Pistol Ass'n, two other courts of appeals refused to enjoin or strike down bans on assault weapons or large-capacity magazines. Affirming the denial of a preliminary injunction in Fyock v. City of Sunnyvale, the Ninth Circuit concluded that the district court neither "clearly err[ed] in finding, based on the record before it, that a regulation restricting possession of [large-capacity magazines] burdens conduct falling within the scope of the Second Amendment," nor "abused its discretion by applying intermediate scrutiny or by finding that [the regulation] survived intermediate scrutiny."  See 779 F.3d 991, 998-99 (9th Cir. 2015).  Thereafter, in Friedman v. City of Highland Park, the Seventh Circuit upheld prohibitions against assault weapons and large-capacity magazines, albeit without applying either intermediate or strict scrutiny.  Under Friedman's reasoning, "instead of trying to decide what 'level' of scrutiny applies, and how it works," it is more suitable "to ask whether a regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-

44

defense." See 784 F.3d 406, 410 (7th Cir.) (internal quotation marks omitted), cert. denied, 136 S. Ct. 447 (2015).

C.

We could resolve the Second Amendment aspects of this appeal by adopting the district court's sound analysis and thereby follow the lead of our distinguished colleagues on the Second and District of Columbia Circuits. That is, we could simply assume that the assault weapons and large-capacity magazines outlawed in Maryland are protected by the Second Amendment and then deem the FSA constitutional under the intermediate scrutiny standard of review. It is more appropriate, however, in light of the dissent's view that such constitutional protection exists, that we first acknowledge what the Supreme Court's Heller decision makes clear: Because the banned assault weapons and large-capacity magazines are "like" "M-16 rifles" — "weapons that are most useful in military service" — they are among those arms that the Second Amendment does not shield. See Heller, 554 U.S. at 627 (recognizing that "M-16 rifles and the like" are not constitutionally protected).

1.

On the issue of whether the banned assault weapons and large-capacity magazines are protected by the Second Amendment, the Heller decision raises various questions. Those include: How many assault weapons and large-capacity magazines must there

45

be to consider them "in common use at the time"? In resolving that issue, should we focus on how many assault weapons and large-capacity magazines are owned; or on how many owners there are; or on how many of the weapons and magazines are merely in circulation? Do we count the weapons and magazines in Maryland only, or in all of the United States? Is being "in common use at the time" coextensive with being "typically possessed by law-abiding citizens for lawful purposes"? Must the assault weapons and large-capacity magazines be possessed for any "lawful purpose[]" or, more particularly and importantly, the "protection of one's home and family"? Is not being "in common use at the time" the same as being "dangerous and unusual"? Is the standard "dangerous and unusual," or is it actually "dangerous or unusual"? See Heller, 554 U.S. at 625, 627, 629; see also N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 254-57; Friedman, 784 F.3d at 408-10; Fyock, 779 F.3d at 997-98; Heller II, 670 F.3d at 1260-61.

Thankfully, however, we need not answer all those difficult questions today, because Heller also presents us with a dispositive and relatively easy inquiry: Are the banned assault weapons and large-capacity magazines "like" "M-16 rifles," i.e., "weapons that are most useful in military service," and thus outside the ambit of the Second Amendment? See 554 U.S. at 627.

46

The answer to that dispositive and relatively easy inquiry is plainly in the affirmative.[10]

Simply put, AR-15-type rifles are "like" M16 rifles under any standard definition of that term. See, e.g., Webster's New International Dictionary 1431 (2d ed. 1948) (defining "like" as "[h]aving the same, or nearly the same, appearance, qualities, or characteristics; similar"); The New Oxford American Dictionary 982 (2d ed. 2005) (defining "like" as "having the same characteristics or qualities as; similar to"). Although an

_____

[10] Our ruling on Second Amendment protection is in line with the State's argument that — because the banned assault weapons and large-capacity magazines are "like" "M-16 rifles" and "most useful in military service" — they are "dangerous and unusual weapons" that are beyond the Second Amendment's reach. See Heller, 554 U.S. at 627; see also Br. of Appellees at 2-4, 16-23; Defs.' Mem. in Supp. of Summ. J. at 3-10, 32-37, Kolbe v. O'Malley, No. 1:13-cv-02841 (D. Md. Feb. 14, 2014), ECF No. 44. We find it unnecessary under Heller, however, to include the term "dangerous and unusual weapons" in the relevant inquiry. That is because the Heller Court plainly pronounced that "weapons that are most useful in military service — M-16 rifles and the like — may be banned" without infringement upon the Second Amendment right. See 554 U.S. at 627. Meanwhile, although the Heller Court suggested that those particular weapons are "dangerous and unusual," the Court did not elaborate on what being "dangerous and unusual" entails. Id. In these circumstances, we deem it prudent and appropriate to simply rely on the Court's clear pronouncement that there is no constitutional protection for weapons that are "like" "M-16 rifles" and "most useful in military service," without needlessly endeavoring to define the parameters of "dangerous and unusual weapons." Questions about that term and the phrases "in common use at the time" and "typically possessed by law-abiding citizens for lawful purposes" are best left for cases involving other sorts of weapons, such as the stun guns at issue in Caetano.

47

M16 rifle is capable of fully automatic fire and the AR-15 is limited to semiautomatic fire, their rates of fire (two seconds and as little as five seconds, respectively, to empty a thirty-round magazine) are nearly identical. Moreover, in many situations, the semiautomatic fire of an AR-15 is more accurate and lethal than the automatic fire of an M16. Otherwise, the AR-15 shares the military features — the very qualities and characteristics — that make the M16 a devastating and lethal weapon of war.

In any event, we need not rely solely on dictionary definitions, because Heller itself expounds on what it means to be "like" the M16. As the plaintiffs would have it, Heller drew a "bright line" between fully automatic and semiautomatic firearms, and thus the AR-15 cannot be considered "like" the M16 for purposes of the Second Amendment. That contention is baseless, however, because Heller did not restrict the meaning of "M-16 rifles and the like" to only fully automatic weapons. Rather, Heller described "M-16 rifles and the like" more broadly, specifically identifying them as being those "weapons that are most useful in military service." Therefore, we identify the line that Heller drew as not being between fully

automatic and semiautomatic firearms, but between weapons that are most useful in military service and those that are not.[11]

Whatever their other potential uses — including self-defense — the AR-15, other assault weapons, and large-capacity magazines prohibited by the FSA are unquestionably most useful in military service. That is, the banned assault weapons are designed to "kill[] or disabl[e] the enemy" on the battlefield. See J.A. 735. The very features that qualify a firearm as a banned assault weapon — such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines — "serve specific, combat-functional ends." See id. at 1120. And, "[t]he net effect of these

---

[11] As further support for the Supreme Court's purported line between fully automatic and semiautomatic firearms, the plaintiffs rely on Staples v. United States, 511 U.S. 600 (1994). There, the Court invalidated Staples's conviction for failing to register a machinegun, because the government had not been required to prove that Staples knew his AR-15 had been modified to be capable of fully automatic fire. In explaining its decision, the Court noted that AR-15s "traditionally have been widely accepted as lawful possessions" in this country. See Staples, 511 U.S. at 612. That statement might be pertinent to this dispute if the State were arguing that the FSA is a "longstanding prohibition[]" against assault weapons and thus presumptively valid. See Heller, 554 U.S. at 626 (cautioning that "nothing in our opinion should be taken to cast doubt on [certain] longstanding prohibitions"). But the issue actually before us is one that the Staples Court did not address: Whether, because of its likeness to the M16 rifle, the AR-15 lacks Second Amendment protection.

49

military combat features is a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns." Id. at 1121-22.

Likewise, the banned large-capacity magazines "are particularly designed and most suitable for military and law enforcement applications." See J.A. 891 (noting that large-capacity magazines are meant to "provide[] soldiers with a large ammunition supply and the ability to reload rapidly"). Large-capacity magazines enable a shooter to hit "multiple human targets very rapidly"; "contribute to the unique function of any assault weapon to deliver extraordinary firepower"; and are a "uniquely military feature[]" of both the banned assault weapons and other firearms to which they may be attached. See id. at 1151.

Because the banned assault weapons and large-capacity magazines are clearly most useful in military service, we are compelled by Heller to recognize that those weapons and magazines are not constitutionally protected. On that basis, we affirm the district court's award of summary judgment in favor

of the State with respect to the plaintiffs' Second Amendment claims.[12]

2.

In the alternative, assuming that the assault weapons and large-capacity magazines prohibited by the FSA are somehow entitled to Second Amendment protection, we conclude that the district court properly upheld the FSA as constitutional under the intermediate scrutiny standard of review.

a.

First of all, intermediate scrutiny is the appropriate standard because the FSA does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home. See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 260 ("Heightened scrutiny need not . . . be akin to strict scrutiny when a law burdens the Second Amendment — particularly when that burden does not constrain the Amendment's core area of

---

[12] In light of our ruling today, we need not reach the State's alternative contention that large-capacity magazines lack constitutional protection because they are not "arms" within the meaning of the Second Amendment. See Heller, 554 U.S. at 582 (observing that the Second Amendment extends to "bearable arms"); Br. of Appellees at 26 ("A large-capacity detachable magazine is not an 'arm' . . . . Indeed, large-capacity magazines are not even ammunition, but instead are devices used for feeding ammunition into firearms that can easily be switched out for other devices that are of lower capacity . . . .").

protection." (internal quotation marks omitted)); Chester, 628 F.3d at 682 ("A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right . . . may be more easily justified." (quoting United States v. Skoien, 587 F.3d 803, 813-14 (7th Cir. 2009), rev'd en banc, 614 F.3d 638 (7th Cir. 2010))).

The FSA bans only certain military-style weapons and detachable magazines, leaving citizens free to protect themselves with a plethora of other firearms and ammunition. Those include magazines holding ten or fewer rounds, nonautomatic and some semiautomatic long guns, and — most importantly — handguns. The handgun, of course, is "the quintessential self-defense weapon." See Heller, 554 U.S. at 629. In contrast, there is scant evidence in the record before us that the FSA-banned assault weapons and large-capacity magazines are possessed, or even suitable, for self-protection. See Kolbe, 42 F. Supp. 3d at 791 (observing that, although the FSA prohibits "a class of weapons that the plaintiffs desire to use for self-defense in the home, there is no evidence demonstrating their removal will significantly impact the core protection of the Second Amendment" (emphasis and citation omitted)).

Notably, the plaintiffs invoke the district court's passing reference to "a class of weapons" in an effort to frame the AR-15 and other FSA-banned assault weapons as a "class" entitled to the same treatment afforded handguns in Heller. See Heller, 554 U.S. at 628 (deeming the District of Columbia's handgun ban to be unconstitutional because it prohibited "an entire class of arms that is overwhelmingly chosen by American society for [self-defense]" (internal quotation marks omitted)). The initial weakness in the plaintiffs' theory is that the banned assault weapons cannot fairly be said to be a "class" like that encompassing all handguns, in that the banned assault weapons are just some of the semiautomatic rifles and shotguns in existence. Accord N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 260 (explaining that "New York and Connecticut have not banned an entire class of arms," but rather "only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features").

The more critical flaw in the plaintiffs' theory is that it ignores the status of handguns as not merely "an entire class of arms," but as "an entire class of arms that is overwhelmingly chosen by American society for [self-defense]." See Heller, 554 U.S. at 628 (emphasis added) (internal quotation marks omitted). As the Third Circuit recently explained, "Heller gives special consideration to the District of Columbia's categorical ban on

53

handguns because they 'are the most popular weapon chosen by Americans for self-defense in the home.' This does not mean that a categorical ban on any particular type of bearable arm is unconstitutional." See United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No.: LW001804, 822 F.3d 136, 144 (3d Cir. 2016) (quoting Heller, 554 U.S. at 629).

At bottom, the FSA's prohibitions against assault weapons and large-capacity magazines simply do "not effectively disarm individuals or substantially affect their ability to defend themselves." See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 260 (quoting Heller II, 670 F.3d at 1262). Nor can the FSA be compared to the handgun ban struck down as unconstitutional in Heller. Hence, assuming the Second Amendment protects the FSA-banned assault weapons and large-capacity magazines, the FSA is subject to the intermediate scrutiny standard of review.

b.

Turning to the application of intermediate scrutiny, the FSA survives such review because its prohibitions against assault weapons and large-capacity magazines are — as they must be — "reasonably adapted to a substantial governmental interest." See Masciandaro, 638 F.3d at 471. To be sure, Maryland's interest in the protection of its citizenry and the public safety is not only substantial, but compelling. See id.

54

at 473 (noting that, "[a]lthough the government's interest need not be 'compelling' under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion" (citing cases)).

The plaintiffs have acknowledged that Maryland has a compelling interest in protecting the public, but argue that such purpose cannot be advanced by the FSA. In support, the plaintiffs have pointed to evidence that non-banned firearms have some of the same attributes as the FSA-banned assault weapons, including the capability to penetrate building materials and soft body armor; that the banned assault weapons are used in few crimes, especially compared to handguns; and that the FSA will not prevent criminals from obtaining the banned assault weapons and large-capacity magazines from other states.[13]

For its part, the State contends that there is a reasonable fit between the FSA and Maryland's interest in public safety. The State emphasizes the military-style features of the banned

---

[13] The plaintiffs also assert that the purported failure of the 1994 federal assault weapons ban demonstrates that the FSA cannot advance Maryland's interest in public safety. As previously explained, see supra note 8, the premise of the plaintiffs' assertion — that the federal ban was wholly ineffective — is not supported by the record. Moreover, the plaintiffs ignore differences between the federal ban and the FSA that strengthen the potential efficacy of the FSA's prohibitions.

assault weapons and large-capacity magazines that render them particularly attractive to mass shooters and other criminals, including those targeting police. The same military-style features pose heightened risks to innocent civilians and law enforcement officers — certainly because of the capability to penetrate building materials and soft body armor, but also because of an amalgam of other capabilities that allow a shooter to cause mass devastation in a very short amount of time.

Upholding the prohibitions against assault weapons and large-capacity magazines in New York and Connecticut, the Second Circuit summarized that,

> [a]t least since the enactment of the federal assault-weapons ban, semiautomatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims. These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers.

See N.Y. State Rifle & Pistol Ass'n, 804 F.3d at 262 (footnotes omitted); see also id. at 263 ("The record evidence suggests that large-capacity magazines may present even greater dangers to crime and violence than assault weapons alone, in part because they are more prevalent and can be and are used in both assault weapons and non-assault weapons." (footnote, alteration, and internal quotation marks omitted)).

56

Although the plaintiffs fault the FSA for not targeting the firearms most used in crime and for not thereby promising to reduce gun crimes in Maryland overall, that is not the FSA's purpose. Rather, as the State has described it, the primary goal of the FSA "is to reduce the availability of assault long guns and large-capacity magazines so that when a criminal acts, he does so with a less dangerous weapon and less severe consequences." See Br. of Appellees 42. Another objective is to prevent the unintentional misuse of assault weapons and large-capacity magazines by otherwise law-abiding citizens. Maryland relied on evidence that, by reducing the availability of such weapons and magazines overall, the FSA will curtail their availability to criminals and lessen their use in mass shootings, other crimes, and firearms accidents.

The judgment made by the General Assembly of Maryland in enacting the FSA is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court. That is, "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." See Woollard, 712 F.3d at 881 (quoting Kachalsky v. Cty. of Westchester, 701 F.3d 81, 99 (2d Cir. 2012)). And, "we must 'accord substantial deference to the predictive judgments of [the legislature].'" See Satellite Broad. & Commc'ns Ass'n v. FCC, 275 F.3d 337, 356 (4th Cir. 2001) (quoting Turner Broad.

57

Sys., Inc. v. FCC, 512 U.S. 622, 666 (1994) ("Turner I")). Our obligation is simply "to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." See Turner I, 512 U.S. at 666; accord Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997) ("Turner II").[14]

Being satisfied that there is substantial evidence indicating that the FSA's prohibitions against assault weapons and large-capacity magazines will advance Maryland's goals, we conclude that the FSA survives intermediate scrutiny. Simply put, the State has shown all that is required: a reasonable, if not perfect, fit between the FSA and Maryland's interest in protecting public safety. That is our alternative basis for affirming the district court's award of summary judgment in favor of the State with respect to the plaintiffs' Second Amendment claims.

---

[14] The plaintiffs contend that, under Turner I, Turner II, and subsequent decisions of the courts of appeals, the evidence on which the General Assembly of Maryland relied at the time of the FSA's enactment cannot be deemed "substantial" because the legislative record was too sparse and the State only later amassed evidence for this litigation. We disagree on the grounds that there was ample evidence in the legislative record, and that, in any event, it was appropriate for the State to supplement that evidence in these proceedings. See, e.g., Satellite Broad. & Commc'ns Ass'n, 275 F.3d at 357 ("We may . . . look to evidence outside the legislative record in order to confirm the reasonableness of [the legislature's] predictions.").

D.

We are confident that our approach here is entirely faithful to the Heller decision and appropriately protective of the core Second Amendment right. In contrast, our dissenting colleagues would expand that constitutional protection to even exceptionally lethal weapons of war and then decree that strict scrutiny is applicable to any prohibition against the possession of those or other protected weapons in the home. At bottom, the dissent concludes that the so-called popularity of the banned assault weapons — which were owned by less than 1% of Americans as recently as 2013 — inhibits any efforts by the other 99% to stop those weapons from being used again and again to perpetrate mass slaughters. We simply cannot agree.

1.

To start with, the dissent would extend Second Amendment protection to each and every weapon deemed sufficiently popular — no matter how violent or dangerous that weapon is. See post at 89-107 (Traxler, J., dissenting). Therefore, it is somehow of immense significance to the dissent that, "in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150." Id. at 92 (internal quotation marks omitted). And, it is entirely an irrelevance if "some court concludes [an AR-15 or other banned

59

weapon] has militarily useful features or is too dangerous for civilians to possess." Id. at 102.

Under the dissent's popularity test, whether an arm is constitutionally protected depends not on the extent of its dangerousness, but on how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged. Consider, for example, short-barreled shotguns and machineguns. But for the statutes that have long circumscribed their possession, they too could be sufficiently popular to find safe haven in the Second Amendment. Consider further a state-of-the-art and extraordinarily lethal new weapon. That new weapon would need only be flooded on the market prior to any governmental prohibition in order to ensure it constitutional protection.

As the dissent points out, the same concerns about the popularity test were raised by Justice Breyer in his four-justice Heller dissent. See post at 91 (citing Heller, 554 U.S. at 720-21 (Breyer, J., dissenting)). In our dissenting colleagues' view, "the Heller majority was obviously unmoved by [Justice Breyer's dissent]," thus indicating that Heller adopted the popularity test. Id. Actually, however, Justice Breyer simply expressed that it was not "at all clear to [him] how the majority decides which loaded 'arms' a homeowner may keep," and then he explained why popularity is not a standard that makes

60

sense.  See Heller, 554 U.S. at 720-21 (Breyer, J., dissenting).[15]

Meanwhile, the Heller majority said nothing to confirm that it was sponsoring the popularity test.  Nevertheless, our dissenting colleagues also claim support for the popularity test from the recent two-justice concurring opinion in Caetano, which propounded that, under Heller, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes."  See Caetano, 136 S. Ct. at 1031 (Alito, J., concurring in the judgment).  Of course, that reading of Heller failed to garner a Court majority in Caetano.

We reject the interpretation of Heller embraced by our dissenting colleagues because it is incompatible with Heller's clear and dispositive pronouncement:  There is no Second Amendment protection for "M-16 rifles and the like," i.e., "weapons that are most useful in military service."  See 554

---

[15] Justice Breyer's dissent explained that, under the popularity test, "the majority determines what regulations are permissible by looking to see what existing regulations permit," although "[t]here is no basis for believing that the Framers intended such circular reasoning."  See Heller, 554 U.S. at 721 (Breyer, J., dissenting).  The popularity test also has been characterized as "circular" by the Seventh Circuit, which concluded that "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned.  A law's existence can't be the source of its own constitutional validity."  See Friedman, 784 F.3d at 409.

U.S. at 627.  It would be incongruous to say that <u>Heller</u> makes an exception for such weapons if they are sufficiently popular. That is, although we do not endeavor today to resolve the difficult questions raised by <u>Heller</u> concerning the interplay of "in common use at the time," "typically possessed by law-abiding citizens for lawful purposes," and "dangerous and unusual," <u>see id.</u> at 625, 627, we are entirely convinced that the correct answers to such inquiries cannot and do not culminate in the dissent's popularity test.[16]

In seeking to impugn our ruling on Second Amendment protection, the dissent accuses the en banc majority of a laundry list of misfeasance.  That list includes improperly conjuring up "a heretofore unknown 'test'" of "whether the firearm in question is 'most useful in military service'"; flouting "basic fairness" by neither affording an opportunity to the parties (particularly the plaintiffs) "to squarely meet the

_____

[16] We must also reject the dissent's theory that, consistent with the popularity test, the <u>Heller</u> Court could categorically exclude "weapons that are most useful in military service" from Second Amendment protection, because no such weapon is typically possessed by law-abiding citizens today.  <u>See</u> <u>post</u> at 98-99. The dissent specifically identifies "Gatling guns, mortars, bazookas, etc." and asserts that "no one could claim these items were ever commonly possessed for Second Amendment purposes." <u>Id.</u> at 99.  But the dissent's list of militarily useful weapons makes a critical omission:  the very assault weapons and large-capacity magazines that the dissent insists satisfy the popularity test.

62

issue" nor remanding for the district court to address the issue in the first instance; employing our own "military opinion" to conclude that the assault weapons and large-capacity magazines prohibited by Maryland's FSA are not constitutionally protected; and "abandon[ing] the summary judgment standard and reach[ing] a conclusion based on facts viewed in the light most favorable to the State." See post at 96-97 & nn.4-5.

With all respect, those accusations are entirely unfounded. Although our ruling on Second Amendment protection may seem novel in some quarters, it is solidly predicated on the plain language of Heller and was raised and argued by the State in both the district court proceedings and this appeal. See supra note 10. Specifically, the State has consistently asserted that — because the banned assault weapons and large-capacity magazines are "like" "M-16 rifles" and "most useful in military service" — they are "dangerous and unusual weapons" beyond the reach of the Second Amendment. See Heller, 554 U.S. at 627; see also Br. of Appellees at 2-4, 16-23; Defs.' Mem. in Supp. of Summ. J. at 3-10, 32-37, Kolbe v. O'Malley, No. 1:13-cv-02841 (D. Md. Feb. 14, 2014), ECF No. 44. That very argument was acknowledged and discussed both in the district court's Opinion and in the dissent to our panel majority's now-vacated Second Amendment decision. See Kolbe v. Hogan, 813 F.3d 160, 194, 196 (4th Cir. 2016) (King, J., dissenting in part and concurring in

the judgment in part) (expressing a strong inclination to "proclaim that the Second Amendment is not implicated by the FSA," in that there is no "reasonable basis for saying that, although the M16 is a dangerous and unusual weapon, the AR-15 and similar arms are not"); id. at 195 n.2 (recognizing that large-capacity magazines also "could be deemed dangerous and unusual, in view of evidence that, inter alia, they are particularly designed and most suitable for military and law enforcement applications" (internal quotation marks omitted)); Kolbe, 42 F. Supp. 3d at 789 n.29 (observing that, "[g]iven that assault rifles like the AR-15 are essentially the functional equivalent of M-16s — and arguably more effective — the [reasoning of Heller that M-16s could be banned as dangerous and unusual] would seem to apply here" (citing Heller, 554 U.S. at 627)).

In our analysis, we simply de-emphasize the term "dangerous and unusual," more directly concluding under Heller that, because the banned assault weapons and large-capacity magazines are "like" "M-16 rifles" and "most useful in military service," they are beyond the reach of the Second Amendment. Consequently, the problem for the plaintiffs is not that they have been deprived of an ample opportunity to squarely meet the issue of whether the banned assault weapons and large-capacity magazines are most useful in military service. Instead, the

plaintiffs' problem is that, despite full notice of the issue, they have not and apparently cannot forecast evidence adequately helpful to their cause. Meanwhile, the State's evidence readily establishes that the banned assault weapons and large-capacity magazines are most useful in military service, causing us to neither employ our own "military opinion" nor abandon the summary judgment standard to rule as we do.

Our distinguished dissenting colleagues just as ineffectively attack the merits of our ruling on Second Amendment protection, chiefly complaining that we do not adopt the dissent's illogical popularity test. Elsewhere, the dissent strategically removes the word "most" from Heller's enunciation of the "most useful in military service" inquiry. The dissent thereby incorrectly insists that we are foreclosing Second Amendment protection for weapons that may have some use in military service, including the stun guns at issue in Caetano and even the handguns at issue in Heller. The dissent goes so far as to claim that we "would remove nearly all firearms from Second Amendment protection as nearly all firearms can be useful in military service." See post at 100. At another point, the dissent acknowledges the critical distinction that the Heller Court drew between military weapons at the time of Second Amendment's ratification (arms entitled to constitutional protection because they were otherwise possessed at home by

65

citizen militia members for self-defense) and the military weapons of today (sophisticated arms like the M16 that were developed for modern warfare and thus lack constitutional protection).  But the dissent inconsistently reckons that we have placed a settler's musket outside the ambit of the Second Amendment.

Taking a last shot at our ruling on Second Amendment protection, the dissent endeavors to make the case for the plaintiffs that the FSA-banned assault weapons and large-capacity magazines are not, in fact, most useful in military service.  In so doing, the dissent simply resorts to further obfuscation.  For example, the dissent underscores that the AR-15 and other prohibited semiautomatic rifles are not themselves "in regular use by any military force, including the United States Army, whose standard-issue weapon has been the fully automatic M16- and M4-series rifles."  See post at 102; see also id. at 106 ("If these firearms were such devastating weapons of war, one would think that they would be standard issue for military forces across the globe.").  The dissent characterizes the relevant inquiry as being whether a weapon's "only legitimate purpose is to lay waste to a battlefield full of combatants," id. at 102-03 (emphasis added), and then invokes evidence that there are citizens who possess and use the banned assault weapons for sporting purposes and self-defense, id. at

66

106-07.  The dissent also treats rate of fire as the sole determinative factor and proffers its own evidence that an M16 in semiautomatic mode cannot fire as rapidly — at least not "effectively" — as the State's evidence reflects.  Id. at 103-04; see also id. at 105 n.6 (noting that fully automatic and semiautomatic firearms do not "spray-fire" in precisely the same manner).  Additionally, the dissent parses other individual features of the banned assault weapons, pointing out that some features are shared by non-banned firearms, do not on their own make weapons "more lethal or battle-ready," and can actually render firearms "easier and safer to operate."  Id. at 104-06.  The dissent even emphasizes evidence opining that "[t]he semi-automatic AR15 carbine is likely the most ergonomic, safe, readily available and effective firearm for civilian self-defense."  Id. at 107 (alteration in original) (internal quotation marks omitted).

As the dissent would have it, we groundlessly deem the banned assault weapons to be military-style weapons of war when they are actually nothing of the sort, thereby welcoming prohibitions against a multitude of other firearms.  On that score, however, the dissent is patently alarmist and wrong.

Our ruling on Second Amendment protection is limited and clear:  Because the FSA-banned assault weapons and large-capacity magazines are like M16s, in that they are most useful

67

in military service, they are not protected by the Second Amendment. The relevant question is not whether they are themselves M16s or other arms used by a military; or whether they are useful at all or only useful in military service; or whether they have this or that single feature in common with a non-banned firearm. Rather, the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence here is that they do. See, e.g., J.A. 735, 1121-22 (reflecting that the banned assault weapons are designed to "kill[] or disabl[e] the enemy" on the battlefield, and that "[t]he net effect of [their] military combat features is a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns"); id. at 891, 1151 (indicating that large-capacity magazines "are particularly designed and most suitable for military and law enforcement applications," as well as a "uniquely military feature[]" of both the banned assault weapons and other firearms to which they may be attached). Nothing in our decision today affects or calls into question the Second Amendment protection of weapons that are not most useful in military service — including, of course, Heller's handguns.

68

2.

Finally, unlike us, our esteemed dissenting colleagues would subject the FSA's prohibitions against assault weapons and large-capacity magazines to the ultra-demanding strict scrutiny standard. See post at 107-15. Indeed, the dissent would apply strict scrutiny to any ban on in-home possession of any weapon that satisfies the dissent's popularity test. Meanwhile, we conclude that no more than intermediate scrutiny applies here, in part because the FSA leaves citizens free to protect themselves with handguns and plenty of other firearms and ammunition, and thus does not severely burden the core Second Amendment right to use arms for self-defense in the home. We also take notice of the scant evidence in the record that the banned assault weapons and large-capacity magazines are possessed or suitable for self-protection.

The dissent has no good answer to our analysis. First, the dissent mischaracterizes our Court's recent decision in United States v. Hosford, 843 F.3d 161 (4th Cir. 2016), as holding "that strict scrutiny applies when a law restricting possession of a firearm applies to conduct inside of the home and touches on self-defense concerns." See post at 110. The Hosford panel consisted of three judges in today's en banc majority. What Hosford actually decided is that strict scrutiny does not apply where — as there — a "prohibition does not touch on the Second

69

Amendment's core protections," e.g., where the law "addresses only conduct occurring outside the home[] and does not touch on self-defense concerns." See 843 F.3d at 168. We did not determine in Hosford whether strict scrutiny always or ever applies to laws infringing on the Second Amendment right of self-defense in the home, and we had no reason to do so. In these circumstances, the Hosford decision is not pertinent, and the dissent is simply wrong in arguing otherwise.

The dissent also asserts that our "line of thought was expressly rejected by the Supreme Court in Heller" when it "dismissed the District of Columbia's reverse contention that its handgun ban [was constitutional] because long guns were still permitted for home defense." See post at 111 (emphasis omitted) (citing Heller, 554 U.S. at 629). The dissent's equation of this case and Heller is wholly untenable, however, because it depends on discounting the relevance of the handgun's status as "the quintessential self-defense weapon" — a status that was obviously and unquestionably important to the Heller Court. See Heller, 554 U.S. at 628-29. Nevertheless, the dissent next insists that, in rejecting its reading of Heller, we allow that "any state 'would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home.'" See post at 112 (emphasis omitted) (quoting Caetano, 136 S. Ct. at 1032

70

(Alito, J., concurring in the judgment)).  In reality, without passing on the comparative burdensomeness of bans on any other types of arms, we merely say that a prohibition against assault weapons and large-capacity magazines is far less burdensome on the core Second Amendment right than a ban on handguns. According to the dissent, we thereby improperly discount evidence of the utility of assault weapons and large-capacity magazines for self-defense, but that assertion relies on the same and similar points that fail to make the case for the plaintiffs that such weapons and magazines are not, in fact, most useful in military service.  See id. at 112-14 & n.9.

Ultimately, the dissent would leave it to individual citizens — and disempower legislators — to determine whether a weapon may be possessed for self-defense.  See post at 114 ("As long as the weapon chosen is one commonly possessed by the American people for lawful purposes[,] . . . the state has very little say about whether its citizens should keep it in their homes for protection.").  That is, under the dissent, any ban on the in-home possession of a sufficiently popular weapon would have to withstand strict scrutiny to be allowed to stand.  The Heller Court did not, however, ordain such a trampling of the legislative prerogative to enact firearms regulations to protect all the people.  Rather, as it is here, intermediate scrutiny can be the appropriate standard for assessing the

71

constitutionality of a prohibition against the possession of a weapon in the home. And the FSA survives intermediate scrutiny, assuming the assault weapons and large-capacity magazines that it prohibits are even entitled to Second Amendment protection.

IV.

We next address the plaintiffs' Fourteenth Amendment claims, which are pursued under the Equal Protection Clause (barring a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws"), as well as the Due Process Clause (prohibiting a state from "depriv[ing] any person of life, liberty, or property, without due process of law"). See U.S. Const. amend. XIV, § 1. We are satisfied to affirm the district court's award of summary judgment to the State with respect to those claims.

A.

The first of the plaintiffs' Fourteenth Amendment claims is that the FSA contravenes the Equal Protection Clause by allowing retired Maryland law enforcement officers to receive and possess assault weapons and large-capacity magazines. As previously explained, the relevant provision of the FSA allows the receipt and possession of an assault weapon or large-capacity magazine by a retired Maryland law enforcement officer if such weapon or magazine "is sold or transferred to the person by the law

72

enforcement agency on retirement" or "was purchased or obtained by the person for official use with the law enforcement agency before retirement." See Md. Code Ann., Crim. Law § 4-302(7).

The Supreme Court has recognized that equal protection "is essentially a direction that all persons similarly situated should be treated alike." See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). Thus, a plaintiff challenging a state statute on an equal protection basis "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." See Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) (citing City of Cleburne, 473 U.S. at 439-40). If that initial showing has been made, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. At that step, a court generally presumes that the statute is valid and will reject the challenge "if the classification drawn by the statute is rationally related to a legitimate state interest." See City of Cleburne, 473 U.S. at 440.[17]

---

[17] In certain circumstances, the general presumption of statutory validity "gives way" and stricter judicial scrutiny of a challenged law is warranted. See City of Cleburne, 473 U.S. at 440-41 (observing that higher levels of scrutiny apply to suspect classifications). There is no contention that a
(Continued)

Applying the foregoing principles, we first assess whether the FSA treats similarly situated persons differently. See Morrison, 239 F.3d at 654. More specifically, we examine whether retired Maryland law enforcement officers are similarly situated to other members of the public with respect to the banned assault weapons and large-capacity magazines.

Maryland requires its law enforcement officers to maintain competence relating to firearms. For example, such officers are not entitled to use or carry firearms in their work until they have "successfully complete[d] the applicable firearms classroom instruction, training, and qualification." See Code of Maryland Regulations ("COMAR") 12.04.02.03(A); see also COMAR 12.04.02.06(B) (establishing minimum requirements for long gun instruction, training, and qualification). Thereafter, officers are obliged to complete annual classroom instruction and training for each firearm they are authorized to use or carry. See COMAR 12.04.02.08(A). The failure of an officer to complete his annual training will cause the seizure of his firearms by the Maryland Police Training Commission, or, if those firearms are personally owned by the officer, the loss of his authorization to use them on the job. See COMAR 12.04.02.08(E).

---

heightened level of scrutiny applies to the equal protection challenge in this case.

Finally, officers are trained on the use of deadly force, plus the safe handling and storage of firearms at work and at home. See COMAR 12.04.02.10(C)-(D).

The record shows that Maryland law enforcement officers are also required to complete specialized training in order to use or carry assault weapons. Officers are trained on how and when to utilize assault weapons, and they are taught the techniques that minimize the risks of harm to innocent civilians. After receiving assault weapons training, officers are required to periodically requalify to use or carry such weapons in the line of duty.

As for large-capacity magazines, Maryland law enforcement officers are taught to assess every shot from a firearm for effectiveness and to fully evaluate a hostile situation before firing multiple rounds. The record shows that, at least within four major police agencies — the Maryland State Police, the Baltimore County Police Department, the Baltimore Police Department, and the Prince George's County Police Department — the standard service weapons issued to law enforcement personnel come with large-capacity magazines. Consequently, officers who retire from those departments have been properly trained on the handling and use of such magazines.

Because of the extensive training that Maryland requires of its law enforcement officers, and in light of their experience

75

in public safety, retired Maryland law enforcement officers are not similarly situated to the general public with respect to the assault weapons and large-capacity magazines banned by the FSA. That is, retired officers are better equipped to safely handle and store those weapons and magazines and to prevent them from falling into the wrong hands. Accordingly, we reject the plaintiffs' equal protection challenge for lack of an initial showing that the FSA treats similarly situated persons differently. See Kolbe v. O'Malley, 42 F. Supp. 3d 768, 799 (D. Md. 2014) ("The court cannot conclude that the State of Maryland is treating differently persons who are in all relevant respects alike, and the plaintiffs' equal protection challenge must fail.").[18]

---

[18] In pursuing their equal protection challenge, the plaintiffs rely primarily on Silveira v. Lockyer, wherein the Ninth Circuit concluded that a retired officer exception to an assault weapons ban contravened the Equal Protection Clause. See 312 F.3d 1052, 1089-92 (9th Cir. 2002). We agree with the district court, however, that the Silveira decision "is flawed," as it did not analyze whether there was differential treatment of similarly situated persons. See Kolbe, 42 F. Supp. 3d at 798 n.39. Otherwise, the plaintiffs insist that Maryland's retired law enforcement officers are similarly situated to the general public, in that some individual officers might not have been properly trained on assault weapons or large-capacity magazines. That contention lacks merit because we must look at retired officers as a broader class.

B.

The plaintiffs' second Fourteenth Amendment claim is that the FSA's ban on "copies" of the assault weapons identified in section 5-101(r)(2) of the Maryland Code's Public Safety Article is unconstitutionally vague on its face, in contravention of the Due Process Clause. In particular, they maintain that the statute fails to inform a reasonable person of what constitutes a "cop[y]" of a particular assault weapon. See Md. Code Ann., Pub. Safety § 5-101(r)(2) (defining a "[r]egulated firearm" as "a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon").

As the Supreme Court recently explained, the void-for-vagueness doctrine precludes the enforcement of a criminal statute "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." See Johnson v. United States, 135 S. Ct. 2551, 2556 (2015).[19] A criminal statute need not,

_____

[19] The Supreme Court's Johnson decision — which was rendered in June 2015, nearly a year after the district court's Opinion here — precludes the State's contention that we should uphold the FSA's ban on "copies" under United States v. Salerno, 481 U.S. 739, 745 (1987) (observing that "[a] facial challenge to a legislative Act" requires "the challenger [to] establish that no set of circumstances exists under which the Act would be valid"). In Johnson, the Court rejected the notion that "a vague provision is constitutional merely because there is some
(Continued)

77

however, "spell out every possible factual scenario with celestial precision." See United States v. Hager, 721 F.3d 167, 183 (4th Cir. 2013) (internal quotation marks omitted).

The term "copies," as used in section 5-101(r)(2), is not new to Maryland's firearms statutes. Indeed, Maryland has regulated the "possession, sale, offer for sale, transfer, purchase, receipt, or transport" of certain assault weapons and "their copies" for more than two decades. See 1994 Md. Laws, ch. 456. In May 2010, Maryland's Attorney General rendered an opinion explaining the term "copies" as used in section 5-101(r)(2). He therein observed that the ordinary meaning of the word copy is "a reproduction or imitation of an original." See J.A. 681. The Attorney General explained that, under Maryland law, "a copy of a designated assault weapon must be similar in its internal components and function to the designated weapon." Id. at 678. Thus, "[c]osmetic similarity to an enumerated assault weapon alone would not bring a weapon within the regulated firearms law." Id. Six months later, in November 2010, the Maryland State Police issued a bulletin explaining that it considers a firearm that is cosmetically similar to an assault weapon identified in section 5-101(r)(2) to be a copy

conduct that clearly falls within the provision's grasp." See 135 S. Ct. at 2561.

78

only if it possesses "completely interchangeable internal components necessary for the full operation and function of any one of the specifically enumerated assault weapons." Id. at 676. The Attorney General's opinion, coupled with the State Police bulletin, provide guidance on the term "copies," and that guidance remained in force after the FSA was enacted in 2013.

The Court of Appeals of Maryland has recognized that "legislative acquiescence in the administrative construction [of a statute] gives rise to a strong presumption that the administrative interpretation is correct." See Wash. Suburban Sanitary Comm'n v. C.I. Mitchell & Best Co., 495 A.2d 30, 37 (Md. 1985). Because the Attorney General's 2010 opinion and the subsequent bulletin of the State Police explain how to determine whether a particular firearm is a copy of an identified assault weapon, we cannot conclude that the term "copies" in section 5–101(r)(2) is unconstitutionally vague. See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 504 (1982) (explaining that a municipality may "adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of [an] ordinance").

In further support of their vagueness claim, the plaintiffs argue that the typical gun owner would not know whether the internal components of one firearm are interchangeable with the internal components of some other firearm. That contention

79

misapprehends the vagueness inquiry, which focuses on the intractability of identifying the applicable legal standard, not on the difficulty of ascertaining the relevant facts in close cases. See United States v. Williams, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."); see also Johnson, 135 S. Ct. at 2560 (emphasizing, in ruling that the residual clause of the Armed Career Criminal Act was unconstitutionally vague, the "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider"). The legal standard for determining what qualifies as a copy of an identified assault weapon is sufficiently clear, and we thus reject the plaintiffs' contention that the FSA's ban on copies of assault weapons is unconstitutionally vague. See Kolbe, 42 F. Supp. 3d at 802 ("[T]he court cannot conclude that the [FSA] fails to provide sufficient notice of banned conduct.").[20]

---

[20] In the summary judgment proceedings below, the plaintiffs also unsuccessfully sought to show that the FSA invites arbitrary enforcement. As the district court recognized in disposing of that contention, "[w]hen the terms of a regulation are clear and not subject to attack for vagueness, the plaintiff bears a high burden to show that the standards used by officials enforcing the statute nevertheless give rise to a vagueness (Continued)

V.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

---

challenge." See Kolbe, 42 F. Supp. 3d at 802 (quoting Wag More Dogs, L.L.C. v. Cozart, 680 F.3d 359, 372 (4th Cir. 2012)). The court concluded that the plaintiffs failed to sustain that substantial burden, in that they have not identified any arrests or convictions resulting from a misunderstanding of the term "copies," as used in section 5-101(r)(2), nor have they identified any acquittals based on the alleged vagueness of that term. The plaintiffs did not endeavor on appeal to demonstrate that there has been arbitrary enforcement of the "copies" provision.

WILKINSON, Circuit Judge, with whom WYNN, Circuit Judge, joins, concurring:

I am happy to concur in Judge King's fine opinion in this case.

No one really knows what the right answer is with respect to the regulation of firearms. It may be that relatively unrestricted access to guns will diminish the incidence of crime by providing a deterrent force against it. On the other hand, it may be that such access leads only to a proliferation of incidents in which the most deadly firearms are unleashed against the public.

The question before us, however, is not what the right answer is, but how we may best find it. The dissent aspires to subject a host of firearm regulations to "strict scrutiny," a term of art deployed here to empower the judiciary and leave Congress, the Executive, state legislatures, and everyone else on the sidelines. I am unable to draw from the profound ambiguities of the Second Amendment an invitation to courts to preempt this most volatile of political subjects and arrogate to themselves decisions that have been historically assigned to other, more democratic, actors. The fact that Heller exempted from legislative infringement handguns broadly utilized for self-defense in the home does not mean that it disabled legislatures from addressing the wholly separate subject of

82

assault weapons suitable for use by military forces around the globe. See District of Columbia v. Heller, 544 U.S. 570, 626-28 (2008).

Disenfranchising the American people on this life and death subject would be the gravest and most serious of steps. It is their community, not ours. It is their safety, not ours. It is their lives, not ours. To say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design their destiny – this would deliver a body blow to democracy as we have known it since the very founding of this nation.

In urging us to strike this legislation, appellants would impair the ability of government to act prophylactically. More and more under appellants' view, preventive statutory action is to be judicially forbidden and we must bide our time until another tragedy is inflicted or irretrievable human damage has once more been done. Leaving the question of assault weapons bans to legislative competence preserves the latitude that representative governments enjoy in responding to changes in facts on the ground. Constitutionalizing this critical issue will place it in a freeze frame which only the Supreme Court itself could alter. The choice is ultimately one of flexibility versus rigidity, and beyond that, of whether conduct that has

visited such communal bereavement across America will be left to the communal processes of democracy for resolution.

Providing for the safety of citizens within their borders has long been state government's most basic task. See, e.g., Boston Beer Co. v. Massachusetts, 97 U.S. 25, 32 (1877). In establishing the "right of law-abiding, responsible citizens to use arms in defense of hearth and home," Heller did not abrogate that core responsibility. 554 U.S. at 635. Indeed, Heller stopped far short of the kind of absolute protection of assault weapons that appellants urge on us today. The dissent, by contrast, envisions the Second Amendment almost as an embodiment of unconditional liberty, thereby vaulting it to an unqualified status that the even more emphatic expressions in the First Amendment have not traditionally enjoyed. As Judge King has aptly noted, Heller was a cautiously written opinion, which reserved specific subjects upon which legislatures could still act. See id. at 626 (recognizing that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"). Had Heller in fact failed to reserve those subjects, or had it been written more ambitiously, it is not clear that it could have garnered the critical five votes.

The weapons that Maryland sought to regulate here are emphatically not defensive in nature. Of course, no weapon is

what we learned long ago in real property class to call a fixture. Weapons may remain at home for a while but their station is not permanent. They can always be taken out on the town. For what purpose? The Maryland legislature could readily conclude that assault weapons, unlike handguns, are efficient instruments of mass carnage, and in fact would serve as weapons of choice for those who in a commando spirit wish to charge into a public venue and open fire. Likewise, the legislature could validly determine that large detachable magazines with a capacity of more than ten rounds of ammunition in fact facilitate assaults by those who seek to eliminate the need to reload.

If this statute is struck down, it is difficult to see what class of non-automatic firearms could ever be regulated. If these weapons are outside the legislative compass, then virtually all weapons will be. It is altogether fair, of course, to argue that the assault weapons here should be less regulated, but that is for the people of Maryland (and the Virginias and the Carolinas) to decide.

Appellants claim, however, that these assault weapons cannot be banned because they are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes." Appellants' Supp. Br. 20-23. This language was of course employed in Heller, 554 U.S. at 624-28, but it did not

85

purport to make any inquiry into common usage and typical possession the exclusive province of the courts. The dissent's forays into the properties and usages of this or that firearm are the kind of empirical inquiries routinely reserved for legislative bodies which possess fact-finding capabilities far superior to the scantily supported views now regularly proffered from the bench. In fact, legislators are uniquely suited to discern popular habits and to understand regular usage within the populace. The term "common use" was never meant to deal to courts the sole and supreme hand in a political controversy where the combatants on both sides are robust, where they are energized, and where they are well stocked with arguments they can press before the public.

As Heller recognized, there is a balance to be struck here. While courts exist to protect individual rights, we are not the instruments of anyone's political agenda, we are not empowered to court mass consequences we cannot predict, and we are not impaneled to add indefinitely to the growing list of subjects on which the states of our Union and the citizens of our country no longer have any meaningful say.

With all respect for my good colleagues who see this important matter differently, I would uphold the Maryland law in its entirety.

DIAZ, Circuit Judge, concurring in part:

I am pleased to join the majority in affirming the district court's judgment. But like the district court, I think it unnecessary to decide whether the assault weapons and large-capacity magazines at issue here are protected by the Second Amendment. Rather, I am content to decide this case solely on the majority's alternative (and compelling) rationale--that even if Maryland's statute implicates the Second Amendment, it nonetheless passes constitutional muster.

TRAXLER, Circuit Judge, with whom NIEMEYER, SHEDD, and AGEE, Circuit Judges, join, dissenting:

Today the majority holds that the Government can take semiautomatic rifles away from law-abiding American citizens. In South Carolina, North Carolina, Virginia, West Virginia and Maryland, the Government can now tell you that you cannot hunt with these rifles. The Government can tell you that you cannot shoot at targets with them. And, most importantly, the Government can tell you that you cannot use them to defend yourself and your family in your home. In concluding that the Second Amendment does not even apply, the majority has gone to greater lengths than any other court to eviscerate the constitutionally guaranteed right to keep and bear arms.

In addition, the majority holds that even if it is wrong when it says that the Second Amendment does not cover these commonplace rifles, Maryland can still lawfully forbid their purchase, even for self defense in one's home-the core Second Amendment right. My friends do not believe this ruling impairs the rights citizens have under the Constitution to any significant degree. In my view, the burden imposed by the Maryland law is considerable and requires the application of strict scrutiny, as is customary when core values guaranteed by the Constitution are substantially affected. I recognize that after such a judicial review, the result could be that the

88

Maryland law is constitutional. I make no predictions on that issue. I simply say that we are obligated by Supreme Court precedent and our own to treat incursions into our Second Amendment rights the same as we would restrictions on any other right guaranteed us by our Constitution.

Therefore I respectfully dissent.

## I. The Second Amendment Protects Semiautomatic Rifles and Large Capacity Magazines

### A. Semiautomatic rifles are commonly possessed by law-abiding citizens.

The majority says first that the Second Amendment does not even <u>apply</u> to modern semiautomatic rifles or magazines holding more than ten rounds. In doing so, the majority stands alone from all the other courts to have considered this issue. But the scope of the Second Amendment is broad with regard to the kinds of arms that fall within its protection, "extend[ing], prima facie, to all instruments that constitute bearable arms." <u>District of Columbia v. Heller</u>, 554 U.S. 570, 582 (2008). Of course, like other constitutionally protected rights, "the right secured by the Second Amendment is not unlimited." <u>Id.</u> at 626. Of particular importance here are the historical limitations that apply to the <u>types</u> of arms a law-abiding citizen may bear. In that regard, the Second Amendment protects those weapons "typically possessed by law-abiding citizens for lawful purposes." <u>Id.</u> at 625. By contrast, "the carrying of

89

'dangerous and unusual weapons'" has been prohibited as a matter of "historical tradition." Id. at 627; see Caetano v. Massachusetts, 136 S. Ct. 1027, 1028 (2016) (per curiam). If a weapon is one "typically possessed by law-abiding citizens for lawful purposes," Heller, 554 U.S. at 625, then it cannot also be a "dangerous and unusual" weapon in a constitutional sense, id. at 627 (weapons "in common use at the time" did not include "dangerous and unusual weapons" (internal quotation marks omitted)). Indeed, Heller refers to "dangerous and unusual" conjunctively, so that even a "dangerous" weapon enjoys constitutional protection if it is widely held for lawful purposes. See Caetano, 136 S. Ct. at 1031 (explaining that the dangerous and unusual test "is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual") (Alito, J., concurring). The significance of this rule is that "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." Id. Simply put, if the firearm in question is commonly possessed for lawful purposes, it falls within the protection of the Second Amendment. See Heller, 554 U.S. at 627.

My colleagues in the majority reject the foregoing "common use" analysis, characterizing it as a "popularity test" founded on "circular" reasoning such that "a state-of-the-art and extraordinarily lethal new weapon . . . would need only be

flooded on the market prior to any governmental prohibition in order to ensure it constitutional protection." But the majority's beef is not with me—it is with the Supreme Court of the United States. Justice Breyer raised a quite similar objection to this "popularity test" in his Heller dissent:

> [I]f Congress and the States lift restrictions on the possession and use of machineguns, and people buy machineguns . . . the Court will have to reverse course and find that the Second Amendment does, in fact, protect the individual self-defense-related right to possess a machinegun. On the majority's reasoning, if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so. . . . There is no basis for believing that the Framers intended such circular reasoning.

554 U.S. at 720–21. Justice Breyer effectively raised my colleagues' precise criticism in his Heller dissent and the Heller majority was obviously unmoved by it.

And, indeed, following Heller, almost every federal court to have considered "whether a weapon is popular enough to be considered in common use has relied on statistical data of some form, creating a consensus that common use is an objective and largely statistical inquiry." Hollis v. Lynch, 827 F.3d 436, 449 (5th Cir. 2016) (internal quotation marks omitted). It is beyond any reasonable dispute from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds)

91

for lawful purposes.  Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States.  In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales.  In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was "more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150."  J.A. 1878.  In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of Heller.

The number of jurisdictions where possession of semiautomatic rifles is lawful is also an appropriate consideration in determining common use for lawful purposes. See Caetano, 136 S. Ct. at 1032-33 (Alito, J., concurring) (explaining that the 200,000 tasers and stun guns in the United States are commonly possessed for lawful purposes and "widely owned and accepted as a legitimate means of self-defense across the country" where 45 states permit their lawful possession). The semiautomatic rifle has been in existence since at least the turn of the Twentieth Century.  Today, more than 100 years after these firearms came into use, individual citizens may possess semiautomatic rifles like the AR-15 semiautomatic in at least 44

states, which establishes that these weapons are widely accepted across the country as firearms that may be legitimately possessed for lawful purposes. See Robert J. Cottrol and George A. Mocsary, Guns, Bird Feathers, and Overcriminalization: Why Courts Should Take the Second Amendment Seriously, 14 Geo. J. L. & Pub. Pol'y 17, 36 (2016) (noting that "[s]even states, the District of Columbia, and a few localities regulate or ban so-called assault weapons"); see id. at 36 n.106 ("The states [banning or regulating "assault weapons"] are California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York.").[1]

In view of the significant popularity of these firearms, courts have had little difficulty in concluding that semiautomatic rifles such as the AR-15 are in common use by law-abiding citizens. See, e.g., Heller v. District of Columbia ("Heller II"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and

---

[1] Although Hawaii is listed, it bans assault pistols only; semiautomatic rifles such as the AR-15 are still permitted in Hawaii. See Haw. Rev. Stat. §§ 134-1, 134-4, 134-8.

14.4 percent of all rifles, produced in the U.S. for the domestic market."); New York State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 255 (2d Cir. 2015) ("This much is clear: Americans own millions of the firearms that the challenged legislation prohibits. . . . Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in Heller."); Colorado Outfitters Ass'n v. Hickenlooper, 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014) (concluding that statute "affects the use of firearms that are both widespread and commonly used for self-defense," in view of the fact that "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions"), vacated in part on other grounds, 823 F.3d 537 (10th Cir. 2016).

The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: "[O]n a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds." J.A. 2122. Even more than 20 years ago, "fully 18 percent of all firearms owned by civilians . . . were equipped with magazines holding more than ten rounds." Heller

94

II, 670 F.3d at 1261; see Fyock v. City of Sunnyvale, 779 F.3d 991, 998 (9th Cir. 2015) ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [such] magazines are in common use.")[2]

Millions of Americans keep semiautomatic rifles and use them for lawful, non-criminal activities, including as a means to defend their homes. Plaintiffs Kolbe and Turner both seek to acquire and keep semi-automatic rifles, equipped with magazines able to hold more than 10 rounds, in their homes primarily for self-defense – a common and legitimate purpose for possessing these firearms. Plaintiffs' expert James Curcuruto presented survey evidence showing that self-defense was a primary reason for the purchase of weapons banned under the FSA, and a 1989 Report from the Bureau of Alcohol, Tobacco, and Firearms indicated that self-defense was a suitable purpose for semiautomatic rifles. The State's expert Daniel Webster even agreed that it is reasonable to assume that a purpose for keeping one of the prohibited weapons is "self-defense in the home." J.A. 2291.

---

[2] Although the majority does not reach the issue of whether detachable magazines constitute bearable arms entitled to Second Amendment protection, such magazines quite clearly constitute arms for the reasons set forth in the now vacated panel opinion. See Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016).

Because the evidence before us clearly demonstrates that these popular weapons are commonly possessed for lawful purposes and are therefore not dangerous and unusual, they are covered by the Second Amendment. The majority errs in holding otherwise.[3]

B. The Majority's Balancing Test is contrary to Heller.

Rather than apply the Supreme Court's common-use test to determine whether the Second Amendment applies to a particular type of weapon or magazine, the majority creates a heretofore unknown "test," which is whether the firearm in question is "most useful in military service."[4] Under this newly-birthed

---

[3] It is evident that my good friends in the majority simply do not like Heller's determination that firearms commonly possessed for lawful purposes are covered by the Second Amendment. In the majority's view, Heller's "commonly possessed" test produces unacceptable results in this case, providing Second Amendment coverage for semiautomatic rifles owned by less than 1% of the American public and thwarting "efforts by the other 99%" to ban them. Majority Op. at 60. This assertion rests on the false premise that every American who does not own a semiautomatic rifle wishes to ban them. That is quite a stretch. In fact, a recent Gallup poll shows that public support for a so-called assault weapons ban is at 36%. Thus, for what it is worth, substantially more Americans oppose a ban than favor it. See www.gallup.com/poll/196658/support-assault-weapons-ban-record-low.aspx (last visited Feb. 13, 2017).

[4] Since the majority has not previously articulated this novel interpretation of Heller, neither side in the district court focused its evidence or legal arguments on proving or disproving that semiautomatic rifles such as the AR-15 are "most useful" as military weapons or on the question of whether qualifying as "militarily useful" would remove the weapon from Second Amendment protection. And the district court likewise did not address these questions. If this is the new standard, then basic fairness requires that the plaintiffs have an (Continued)

test, which seems to be a stand-alone inquiry, the Second Amendment does not apply if a court deems a weapon "most useful" in combat operations. And in the case before us today, the majority concludes that the Second Amendment does not apply at all because semiautomatic rifles, in the military opinion of the majority, are more useful as military weapons than as weapons for individual self-defense, hunting and target or sport shooting. See Majority Op. at 47 ("Whatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines prohibited by the FSA are unquestionably most useful in military service."). This analysis is clearly at odds with the Supreme Court's approach in Heller setting out how courts, including the majority, are to go about a Second Amendment inquiry.[5]

---

opportunity to squarely meet the issue. See United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010) ("Having established the appropriate standard of review, we think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond. Both sides should have an opportunity to present their evidence and their arguments to the district court in the first instance.").

[5] In articulating and then applying its novel military usefulness test, not only has the majority failed to afford plaintiffs an opportunity to respond, but it has abandoned the summary judgment standard and reached a conclusion based on facts viewed in the light most favorable to the State, the proponent of the summary judgment motion, and not the plaintiffs as the non-movants. See Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013) (applying Fed. R. Civ. P. 56(a) in Second (Continued)

97

First, the majority simply ignores "the pertinent Second Amendment inquiry"—"whether [the firearms at issue] are commonly possessed by law-abiding citizens for lawful purposes today." Caetano, 136 S. Ct. 1032 (Alito, J., concurring) (emphasis omitted). But, this omission is understandable in light of the millions of law-abiding Americans who possess the semiautomatic rifles at issue, as explained previously. It is beyond debate.

Second, the majority makes no attempt to demonstrate that semiautomatic rifles have been historically prohibited as "dangerous and unusual" weapons. Instead, our court today has adopted an ad hoc analysis that excludes a weapon from Second Amendment protection if it appears to be "like" an M-16 or "most useful in military service." Under this approach, it is irrelevant that a firearm may have been commonly possessed and widely accepted as a legitimate firearm for law-abiding citizens for hundreds of years; such a weapon could be removed from the scope of the Second Amendment so long as a court says it is "like" an M-16 or, even easier, just calls it a "weapon of war." Indeed, Justice Alito pointed out in his Caetano concurrence that even a stun gun capable of only non-lethal force is

Amendment context and "viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party").

98

suitable for military use.  See id.  Obviously, what the majority ignores from Heller is that "weapons that are most useful in military service--M-16 rifles and the like"--are not "typically possessed by law-abiding citizens" today.  Heller, 554 U.S. at 625, 627.  While the majority's quoted reference from Heller would exclude weapons "most useful in military service" such as Gatling guns, mortars, bazookas, etc., no one could claim these items were ever commonly possessed for Second Amendment purposes.  Indeed, such "M-16 rifles and the like" are outside the Second Amendment because they "are highly unusual in society at large."  Id. at 627.

Third, Heller in no way suggests that the military usefulness of a weapon disqualifies it from Second Amendment protection.  That is the majority's singular concoction.  On the contrary, the Second Amendment has always been understood to cover weapons useful in military operations.  Indeed, the Second Amendment at the Founding was grounded in the need to safeguard the commonly possessed weapons of citizens for military service.  "[A]t the time of the Second Amendment's ratification," it was understood that "all citizens capable of military service . . . would bring the sorts of lawful weapons that they possessed at home to militia duty."  Heller, 554 U.S. at 627.  "'Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in

common use at the time.'" Id. at 624 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)) (alterations omitted). Under the majority's analysis, a settler's musket, the only weapon he would likely own and bring to militia service, would be most useful in military service—undoubtedly a weapon of war—and therefore not protected by the Second Amendment. This analysis turns Heller on its head. Indeed, the Court in Heller found it necessary to expressly reject the view that "only those weapons useful in warfare are protected." Id. (emphasis added). Weapons useful in warfare are obviously protected by the Second Amendment; if this were not so, the Court would have had no reason to caution against the assumption that the Second Amendment protects only weapons useful in military operations.

Read in context, Heller's reference to "weapons that are most useful in military service" clearly does not provide some alternative to the "in common use" query for determining whether the Second Amendment applies. If it were otherwise, the "most useful in military service" rubric would remove nearly all firearms from Second Amendment protection as nearly all firearms can be useful in military service. Heller settled "a decades-long debate between those who interpreted the text to guarantee a private, individual right to bear arms and those who generally read it to secure a collective right to bear arms in connection with service in the state militia." Chester, 628 F.3d at 674–

100

75. Heller determined that the prefatory clause of the Second Amendment, which refers to the militia, does not limit the right to "keep and bear Arms" set forth in the operative clause, 554 U.S. at 578, and therefore that the Second Amendment "protects an individual right to possess a firearm unconnected with service in a militia," id. at 577. In addressing the criticism that the Court had simply read the prefatory clause out of the Second Amendment, the Court explained:

> It may be objected that if weapons that are most useful in military service—M-16 rifles and the like— may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.

Id. at 627-28 (emphasis added). Thus, because the Second Amendment "protects an individual right to possess a firearm unconnected with service in a militia," id. at 577, "whether a weapon has a nexus to military utility is not the test as to whether that weapon receives Second Amendment protection," Hollis, 827 F.3d at 446.

In sum, if a "weapon belongs to a class of arms commonly used for lawful purposes," Caetano, 136 S. Ct. at 1031 (Alito, J., concurring), then it comes within the ambit of the Second Amendment and our threshold inquiry is at an end. The fact that a weapon is designed "for the purpose of bodily assault" and "constructed to produce death or great bodily harm" "cannot be used to identify arms that fall outside the Second Amendment." Id. (internal quotation marks omitted). That is, "the relative dangerousness of a weapon is irrelevant" where the weapon is "commonly used for lawful purposes." Id. Under Heller, therefore, even a weapon that some court concludes has militarily useful features or is too dangerous for civilians to possess is covered by the Second Amendment if it is "commonly used for lawful purposes."

> C. It is anything but clear that semiautomatic sporting rifles are "weapons of war."

The majority concludes that the semiautomatic rifles banned by Maryland law are most useful in military service, even though they are not in regular use by any military force, including the United States Army, whose standard-issue weapon has been the fully automatic M16- and M4-series rifles. See Hollis, 827 F.3d at 440 n.2.

In its effort to show that semiautomatic rifles are devastating weapons of war whose only legitimate purpose is to

102

lay waste to a battlefield full of combatants, the majority first states that the rates of fire between the fully automatic M16 service rifle and the semiautomatic AR-15 sporting rifle are "nearly identical." This claim seems counter-intuitive because semiautomatic firearms require that the shooter pull the trigger for each shot fired, while fully automatic weapons—otherwise known as "machine guns"—do not require a pull of the trigger for each shot and will discharge every round in the magazine as long as the trigger is depressed. See Staples v. United States, 511 U.S. 600, 602 n. 1 (1994). The rate of fire of a semiautomatic firearm is determined simply by how fast the shooter can squeeze the trigger.

The majority's assertion might surprise the United States Army, which sets the maximum effective rates of M4- and M16- series rifles operating in semi-automatic mode at 45 to 65 rounds per minute--only about five rounds in five seconds (not 30 rounds as the majority believes). This is far slower than 150 to 200 rounds per minute that may effectively be fired by the same arms operating in fully automatic mode. See United States Dep't of Army, Field Manual 3-22.9, Rifle Marksmanship, M16-/M4-Series Weapons, Table 2-1 (2008). Some of the experts at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF") might be surprised as well, in light of the testimony submitted to Congress on behalf of BATF:

> The AK-47 is a select fire weapon capable of firing 600 rounds per minute on full automatic and 40 rounds per minute on semi-automatic. The AKS and AK-47 are similar in appearance. The AK-47 . . . [has] been manufactured as a machine gun. . . . The AKS is a semi-automatic that, except for its deadly military appearance, is no different from other semi-automatic rifles.

Hearings on S. 386 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 101st Cong. 28-29 (1989).

Of course, if the majority is correct that the semiautomatic AR-15's rate of fire makes it a weapon of war outside the scope of the Second Amendment, then all semiautomatic firearms—including the vast majority of semiautomatic handguns—enjoy no constitutional protection since the rate of fire for any semiautomatic firearm is determined by how fast the shooter can squeeze the trigger. Such a conclusion obviously flies in the face of Heller, which never mentions rate of fire as a relevant consideration. Likewise, the suggestion that the ability to accept large-capacity magazines facilitates a firearm's military usefulness applies to all semiautomatic weapons, including constitutionally-protected handguns, since any firearm that can hold a magazine can theoretically hold one of any size.

The majority also suggests that other features of semiautomatic rifles like the AR-15 make them devastating military weapons. But several of the features identified do not

make the firearms more lethal or battle-ready, but easier to use.  On the contrary, many of the "military-style" components "increase accuracy and improve ergonomics."  J.A. 2100.  A telescoping stock, for example, permits the operator to adjust the length of the stock according to his or her physical size so that the rifle can be held comfortably.  J.A. 2182.  Likewise, a pistol grip provides comfort, stability, and accuracy, see David B. Kopel, Rational Basis Analysis of "Assault Weapon" Prohibition, 20 J. Contemp. L. 381, 396 (1994) ("By holding the pistol grip, the shooter keeps the barrel from rising after the first shot, and thereby stays on target for a follow-up shot. The defensive application is obvious, as is the public safety advantage in preventing stray shots."), and  barrel shrouds keep the operator from burning himself or herself upon contact with the barrel.[6]  And although flash suppressors can indeed conceal a shooter's position—which is also an advantage for someone defending his or her home at night—they serve the primary function of preventing the shooter from being blinded in low-lighting conditions.   See Kopel, at 397 ("Reduced flash

---

[6] These features, the majority suggests, enable a shooter to "spray-fire" rounds everywhere.  "Spray-firing" can only be accomplished with a fully automatic assault rifle like an M4 carbine; "[i]n semiautomatic mode it is possible to either aim fire or to point shoot, but it is not possible to spray fire in the manner as one would in fully automatic mode."  J.A. 2128.

decreases shooter's blindness--the momentary blindness caused by the sudden flash of light from the explosion of gunpowder. The flash reduction is especially important for shooting at dawn or at dusk."). None of these features convert a semiautomatic rifle into a weapon of war like a machinegun carried into battle by actual soldiers. It is unclear to me why features that make a firearm easier and safer to operate add to its battlefield prowess.[7]

In deciding that the banned semiautomatic rifles "are unquestionably most useful in military service," the majority cavalierly dismisses "their other potential uses" without discussion. The irony is that millions of law-abiding Americans actually use these versatile guns, while there do not seem to be any military forces that routinely carry an AR-15 or other semiautomatic sporting rifles as an officially-issued service weapon—at least the majority has not identified any. If these firearms were such devastating weapons of war, one would think that they would be standard issue for military forces across the globe. Whatever the potential military usefulness of these

---

[7] Nor does it appear that an AR-15-style rifle fires rounds that create a greater risk to civilians than rounds fired by a standard hunting rifle. In fact, just the opposite is true. The AR-15's standard .223/5.56 mm ammunition is "quite anemic in penetration capability and pale[s] in destructive capacity when compared to common civilian hunting rifles . . . ." J.A. 2095.

weapons, millions of American citizens <u>actually</u> use them for sporting purposes and possess them to defend themselves, their families and their homes. Indeed, plaintiffs' evidence suggests that "[t]he semi-automatic AR15 carbine is likely the most ergonomic, safe, readily available and effective firearm for civilian self-defense." J.A. 2091.[8]

The semiautomatic firearms banned by Maryland are commonly "chosen by Americans for self-defense in the home" and are thus clearly protected by the Second Amendment--"[w]hatever the reason" for their popularity. <u>Heller</u>, 554 U.S. at 629. The real question is whether the district court applied the appropriate level of scrutiny in determining any limitations on Second Amendment protection. As explained below and in the now-vacated panel opinion, <u>see</u> <u>Kolbe</u>, 813 F.3d at 179-84, it did not.

## II. Strict Scrutiny Applies

To select the proper level of scrutiny, we consider "the nature of the conduct being regulated and the degree to which

---

[8] The majority's utilization of the "military use" theory instead of the common use test produces ironic results. For example, the law my colleagues uphold today permits Maryland residents to possess the M1 Garand rifle, which was the standard-issue battle rifle for American troops in World War II and the Korean War. The result of the holding in this case is that it is legal in Maryland to possess a rifle that was actually used by our military on the battlefield, but illegal to possess a rifle never used by our military.

107

the challenged law burdens the right." Chester, 628 F.3d at 682. "A severe burden on the core Second Amendment right of armed self-defense should require strong justification." United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) (internal quotation marks omitted). However, "laws that do not implicate the central self-defense concern of the Second Amendment[] may be more easily justified." Id. (internal quotation marks omitted); see Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 195 (5th Cir. 2012) ("A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing.").

Maryland's ban on the AR-15 and other semiautomatic rifles forbids its law-abiding citizens from purchasing commonly possessed firearms for use in their homes for the protection of self and family. By reaching into private homes, where the protection afforded by the Second Amendment is at its greatest, Maryland's law clearly implicates the "core" of the Second Amendment: "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. The Supreme Court in Heller made clear that the "inherent right of self-defense has been central to the Second Amendment," id. at 628 (emphasis added), and that this central component of the Second Amendment is at its strongest within "the home where

108

the need for defense of self, family, and property is most acute," id. See also Kachalsky v. County of Westchester, 701 F.3d 81, 89 (2d Cir. 2012) ("What we know from [Heller and McDonald v. City of Chicago] is that Second Amendment guarantees are at their zenith within the home."). At stake here is a "basic right," McDonald v. City of Chicago, 561 U.S. 742, 767 (2010), "that the Framers and ratifiers of the Fourteenth Amendment counted . . . among those fundamental rights necessary to our system of ordered liberty," id. at 778. "The [Supreme] Court [in Heller] went to great lengths to emphasize the special place that the home-an individual's private property-occupies in our society." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir. 2012).

The majority is incredulous that we would apply strict scrutiny to a law prohibiting the possession of a commonly used firearm to protect family and home. But, of course we would apply strict scrutiny—we have no other alternative in these circumstances. Once it is determined that a given weapon is covered by the Second Amendment, then obviously the in-home possession of that weapon for self-defense is core Second Amendment conduct and strict scrutiny must apply to a law that prohibits it. This position is not remarkable in the least, and I am not alone in this circuit in adhering to it. Indeed, a panel of this court recently made very clear in United States v.

Hosford that strict scrutiny applies when a law restricting possession of a firearm applies to conduct inside of the home and touches on self-defense concerns. See 843 F.3d 161, 168 (4th Cir. 2016). In Hosford, which was decided after en banc argument in this case, the defendant raised a Second Amendment challenge to his conviction under a law that "impose[d] a licensing requirement on those who wish[ed] to profit by regularly selling firearms outside of their personal collection." Id. In explaining why the law at issue there should receive only intermediate scrutiny, the panel stated as follows:

> Here, even assuming that the prohibition implicates conduct protected by the Second Amendment, the prohibition does not touch on the Second Amendment's core protections. Individuals remain free to possess firearms for self-defense. Individuals also remain free to purchase or sell firearms owned for personal, self-defensive use. . . . [The law] serves, not as a prohibition, but as a condition or qualification. The law, therefore, regulates rather than restricts, addresses only conduct occurring outside the home, and does not touch on self-defense concerns. It is thus subject to intermediate scrutiny.

Id. (emphasis added). In this passage, the Hosford panel very ably shows why intermediate scrutiny is required there, but strict scrutiny is required here. Under the Maryland law we consider today, individuals do not remain free to purchase or possess the banned firearms for self-defense inside of their homes. Thus, Maryland's law restricts rather than regulates; it

110

addresses conduct occurring inside the home; and it directly touches self-defense concerns in the home. Maryland's law imposes dramatic limitations on the core protections guaranteed by the Second Amendment and, as implicitly admitted by the Hosford panel, requires the court to apply strict scrutiny.

My friends in the majority do not apply strict scrutiny because they do not believe that the Maryland law significantly burdens the "core lawful purpose" of the Second Amendment. Their reasoning? Maryland left handguns (and other weapons) for its residents to use to defend their homes, and this ought to be enough. This line of thought was expressly rejected by the Supreme Court in Heller, which dismissed the District of Columbia's reverse contention that its handgun ban did not unconstitutionally burden the right to self-defense because long guns were still permitted for home defense. See Heller, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."); accord Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007) (rejecting the District's argument that alternative weapons rendered handgun ban lawful, calling it "frivolous," and noting that "[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted"). As long as the firearms chosen are those commonly possessed by the American

111

people for lawful purposes—and the rifles at issue here most certainly are—states cannot prohibit their residents from purchasing them for self-defense in the home unless that restriction can meet strict scrutiny review.

The majority, however, implies that this portion of Heller does not apply to a ban of commonly possessed firearms if handguns are still available to the homeowner because handguns are "the quintessential self-defense weapon." 554 U.S. at 629. If the majority were correct, then any state "would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home." Caetano, 136 S. Ct. 1032 (Alito, J., concurring) (internal quotation marks omitted). Under the majority's logic, a state could similarly ban all shotguns, even those commonly used in hunting, and not transgress the Second Amendment, so long as handguns remained lawful to possess. The fact that handguns are still available is irrelevant. If other firearms, though "less popular than handguns," are nonetheless "widely owned and accepted as a legitimate means of self-defense across the country," they cannot be banned simply because more popular handguns are not. Id. at 1033.

Finally, we are told that the ban on semiautomatic rifles is not burdensome because these weapons are not even well-suited for defense of hearth and home—handguns are better and that is

112

all law-abiding citizens need.[9]  This is patently wrong.  First, there are legitimate reasons for citizens to favor semiautomatic rifles over handguns in defending themselves and their families at home.  The record contains evidence, which on summary judgment was to be viewed in the light most favorable to the plaintiffs, suggesting that "handguns are inherently less accurate than long guns" as they "are more difficult to steady" and "absorb less of the recoil[,] . . . [thus] reducing accuracy."  J.A. 2131. This can be an important consideration for a typical homeowner, who "under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target." J.A. 2123. "Nervousness and anxiety, lighting conditions, the presence of physical obstacles . . . , and the mechanics of retreat are all factors which contribute to [the] likelihood" that the homeowner will shoot at but miss a home invader.  Id.  These factors could also affect an individual's ability to reload a firearm quickly during a home invasion.

---

[9] If, as the majority says, there is "scant evidence" that the prohibited semiautomatic rifles are well-suited for home defense, then there is even less reason to believe that these weapons are best suited for combat operations.  After all, it cannot be disputed that one reason non-criminal citizens actually keep these weapons at home is for self-defense.  I have searched the record in vain for the statistics on how many standing armies issue AR-15s or semiautomatic-only-weapons to their troops.  I do not believe there are any.

113

Similarly, a citizen's ability to defend himself and his home is enhanced with an LCM.

Second, the means selected by citizens to defend themselves and their families at home is an intensely personal choice dependent upon circumstances unique to each individual. Not everyone who would bear arms in defense of his home is comfortable or confident using a handgun. As long as the weapon chosen is one commonly possessed by the American people for lawful purposes—and the rifles at issue here most certainly are—the state has very little say about whether its citizens should keep it in their homes for protection. "The question under Heller is not whether citizens have adequate alternatives available for self-defense. Rather, Heller asks whether the law bans types of firearms commonly used for a lawful purpose—regardless of whether alternatives exist." Friedman v. City of Highland Park, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari). "[T]he Second Amendment confers rights upon individual citizens—not state governments," and it clearly does not "delegate to States and localities the power to decide which firearms people may possess." Id. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." Heller, 554 U.S. at 634.

114

Nevertheless, Maryland has taken the choice away from its residents and simply determined that, regardless of the circumstances in any case, its people, whether living in a 700 square-foot apartment or a 50-acre farm, may only protect their loved ones with one of the guns the State thinks they should use—perhaps a handgun, or a slow-to-load bolt-action hunting rifle or a shotgun with heavy recoil. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." Friedman v. City of Highland Park, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting). Indeed, "the ultimate decision for what constitutes the most effective means of defending one's home, family, and property resides in individual citizens and not the government. . . . The extent of danger—real or imagined—that a citizen faces at home is a matter only that person can assess in full." Id. at 413.

For a law-abiding citizen who, for whatever reason, chooses to protect his home with a semi-automatic rifle instead of a semi-automatic handgun, Maryland's law clearly imposes a significant burden on the exercise of the right to arm oneself at home, and it should at least be subjected to strict scrutiny review before it is allowed to stand.

For the reasons I have set forth, I respectfully dissent.

115

TRAXLER, Circuit Judge, dissenting as to Part IV.A and concurring as to Part IV.B:

For the reasons set forth in the now-vacated panel opinion, I dissent from the majority's opinion on the equal protection claim. See Kolbe v. Hogan, 813 F.3d 160, 199-202 (4th Cir. 2016).

I concur in the result reached by the majority with respect to the vagueness challenge, for the reasons expressed in the now-vacated panel opinion. See id. at 190-92.